BOSAK v HUTCHINSON

Docket Nos. 71366, 72467, 72468. Argued April 2, 1985 (Calendar No. 4).—Decided October 22, 1985. Rehearing denied 424 Mich 1201.

Nicholas Bosak and Nancy Bosak, his wife, brought an action in the Wayne Circuit Court against Forsythe Development Company, the general contractor of a construction project, the Hurley Corporation, a company that leased a crane to Concrete Components, Incorporated, Nicholas Bosak's employer and a subcontractor on the project, and Robert Hutchinson, the crane operator, seeking damages for injuries suffered by Nicholas Bosak as a result of a construction site accident in which four fingers of his left hand were severed during the assembly of the crane boom. The plaintiffs alleged that Forsythe was liable because it was actively negligent in directing that the crane be assembled under unsafe conditions and because the assembly was an inherently dangerous activity. They alleged Hurley was liable because the negligence of its employee caused the accident. Forsythe and Hurley brought third-party claims for indemnity against CCI. Prior to trial, Hutchinson was voluntarily dismissed as a defendant, and the court, Susan Borman, J., dismissed Hurley's claim against CCI for indemnification. During trial, CCI was granted summary judgment on Forsythe's claim for indemnification. At the close of evidence, the court, Patrick J. Duggan, J., directed a verdict for Forsythe that the erection of the crane was not an inherently dangerous activity but denied Forsythe a directed verdict with respect to its direct

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] Am Jur 2d, Independent Contractors §§ 24-47.
Liability of employer with regard to inherently dangerous work for injuries to employees of independent contractor. 34 ALR4th 914.

[3] Am Jur 2d, Actions §§ 144-155.

[4] Am Jur 2d, Negligence § 447.
Judicial adoption of comparative negligence doctrine as applicable retrospectively. 78 ALR3d 421.

[5, 6] Am Jur 2d, Trial § 573 et seq.
Sufficiency of evidence, in personal injury action, to prove future pain and suffering and to warrant instructions to jury thereon. 18 ALR3d 10.

negligence. Following a verdict by the jury, finding that the Hurley Corporation was negligent and that its negligence was a proximate cause of the accident but that Nicholas Bosak was comparatively negligent, judgment was entered for the plaintiffs. The plaintiffs' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial or an order of additur was denied. The Court of Appeals, N. J. KAUFMAN, P.J., and WAHLS and CLEMENTS, JJ., initially affirmed in an unpublished opinion per curiam; on rehearing, it vacated its earlier decision, reversed the directed verdict in favor of Forsythe, and remanded the case for a new trial on the plaintiffs' theory of inherently dangerous activity (Docket Nos. 57795, 60565, 60567). The parties appeal.

In an opinion by Justice RILEY, joined by Justices RYAN, BRICKLEY, CAVANAGH, and BOYLE, the Supreme Court *held:*

Liability should not be imposed on an employer of an independent contractor for harm resulting from work caused by the contractor's negligence or that of the contractor's employees where the work is not an inherently dangerous activity, but rather involves a new risk, created in the performance of the work, which was not reasonably contemplated at the time of the contract between the employer and the independent contractor.

1. The inherently dangerous activity doctrine is an exception to the general rule that an employer of an independent contractor is not liable for the contractor's negligence or the negligence of the contractor's employees. Under the doctrine, an employer is liable for harm resulting from work necessarily involving danger to others unless great care is used to prevent injury. The employer is also liable where the work involves a peculiar risk or special danger which calls for special or reasonable precautions. The risk or danger must be recognizable in advance, however, in order to invoke the doctrine. Liability may not be imposed where a new risk is created in the performance of the work which was not reasonably contemplated at the time of contracting. In this case, the assembly of a crane at a construction site did not present a peculiar risk or a special danger; nor was it an inherently dangerous activity. Neither the particular circumstances under which the work was done nor the manner prescribed for doing the work was shown to create a risk of physical harm to others that was recognizable in advance. In addition, there was no evidence that the general contractor at the time of entering into the contract with the subcontractor was aware of the need to erect the crane at the work site or that it would be done at night or

in rainy slippery weather. Rather, the evidence suggests that the work was routine.

2. The award of damages was not so clearly and grossly inadequate as to shock the judicial conscience and warrant additur. On the basis of the evidence presented, the jury could have believed that the plaintiff could have returned to iron-work, but that he voluntarily chose not to return, which would put into dispute the amount of plaintiffs' out-of-pocket expenses. In addition, it cannot be said that the jury's award for damages was compensation for lost wages to the exclusion of other damages. Because there is no absolute standard by which to measure personal injury awards, the determination, particularly where pain and suffering are involved, must rest with the trier of fact.

3. It was proper for the trial court to instruct the jury with regard to Nicholas Bosak's comparative negligence. The plaintiff is chargeable with the duty to guard his own safety, and testimony was offered that, while it might be appropriate for ironworkers to place their hands on gantry lines, holding onto a gantry line close to a sheave might be improper. The plaintiff had worked as an apprentice for three years and had participated in erecting crane booms previously and appeared competent to persons at the job site. The jury could have found that the movement of the crane which caused his injury was foreseeable.

4. The trial court did not err in refusing to instruct the jury to consider inflation in calculating its award of future damages. The trial court permitted plaintiffs' counsel to offer extensive argument on the fact and effect of inflation, but no testimony was presented as to the current or future rates of inflation. The jury was free to apply its common knowledge of and experience with inflation in fashioning the award.

5. The facts necessary to the determination whether the crane was operational at the time of the accident and that the indemnity agreement thus was enforceable are disputed, requiring remand to the trial court for further consideration of the issue.

Chief Justice WILLIAMS, joined by Justice BOYLE, concurring, agreed that in a properly presented case, inflation must be taken into account, but, on the basis of the record, could not say that the trial court erred in refusing to take judicial notice of a future inflation rate of thirteen percent. Consideration of the issue of the necessity of an instruction on inflation to balance the standard jury instruction requiring reduction of future damages to present value should await a case in which a

party makes an appropriate presentation of evidence and legal argument.

Affirmed in part, reversed in part, and remanded.

Justice LEVIN, concurring in part, stated that reversal of the decision of the Court of Appeals should not be predicated on the basis of the inherently dangerous activity issue. Rather, the judgment should be reversed on the ground that even if the trial court erred on that issue, the error was not prejudicial to the plaintiffs because they obtained a judgment against a defendant, the Hurley Corporation, against whom the judgment apparently may be enforced for the amount of damages the jury was willing to award. The Court of Appeals has divided on the application of the inherently dangerous activity doctrine where one defendant seeks indemnification from another, implicating the question whether what constitutes an inherently dangerous activity is a question of law or of fact. Previous Supreme Court case law has not considered and applied the doctrine, in a case where an opinion was signed by a majority of the justices, to allow recovery by an injured worker in a third-party action following the receipt of workers' compensation from his employer. Consideration and application of the doctrine should await a case which makes decision of the issue necessary.

### OPINION OF THE COURT

1. MASTER AND SERVANT — NEGLIGENCE — GENERAL CONTRACTORS — SUBCONTRACTORS — LIABILITY — INHERENTLY DANGEROUS ACTIVITY.

   Liability should not be imposed on an employer of an independent contractor for harm resulting from work caused by the contractor's negligence or that of the contractor's employees where the work is not an inherently dangerous activity, but rather involves a new risk, created in the performance of the work, which was not reasonably contemplated at the time of the contract between the employer and the independent contractor.

2. MASTER AND SERVANT — NEGLIGENCE — GENERAL CONTRACTORS — SUBCONTRACTORS — LIABILITY — INHERENTLY DANGEROUS ACTIVITY.

   An employer of an independent contractor is liable for harm resulting from work necessarily involving danger to others unless great care is used to prevent injury and also where the work involves a peculiar risk or a special danger which calls for special or reasonable precautions; the risk or danger must

be recognizable in advance, however, in order to invoke the inherently dangerous activity doctrine.

3. ACTIONS — PERSONAL INJURY AWARDS — TRIER OF FACT.

No absolute standard is available which can be used to measure the amount of personal injury awards, thus the determination must be made by the trier of fact.

4. NEGLIGENCE — COMPARATIVE NEGLIGENCE — JURY INSTRUCTIONS.

Instruction of a jury with regard to a plaintiff's comparative negligence was proper where the defendant was chargeable with the duty to guard his own safety, testimony was offered that his actions prior to injury might have been improper, the plaintiff was experienced in the use of the machine which caused the injury, and the jury could have found that the movement of the machine that caused the injury was foreseeable.

5. JURY — JURY INSTRUCTIONS — FUTURE DAMAGES — INFLATION.

A jury was free to apply its common knowledge of and experience with inflation in calculating an award of future damages without instruction by the trial court where the plaintiff's counsel was permitted to offer extensive argument on the fact and effect of inflation, but no testimony was offered as to extant or future rates of inflation.

CONCURRING OPINION BY WILLIAMS, C.J.

6. JURY — JURY INSTRUCTIONS — FUTURE DAMAGES — INFLATION.

*A trial court, in an action for damages resulting from injuries received in a construction site accident, did not err in refusing to take judicial notice of a rate of inflation specified by the plaintiffs to be applied in calculating an award of future damages where the plaintiffs presented no evidence regarding inflation.*

*Zeff & Zeff & Materna* (by *Michael T. Materna*) (*Gromek, Bendure & Thomas,* by *John A. Lydick,* of counsel) for the plaintiffs.

*Dice, Sweeney, Sullivan, Feikens, Hurbis & Foster, P.C.* (by *Jack E. Vander Male* and *Jon Feikens*), for The Hurley Corporation.

*Joselyn, Rowe, Jamieson, Grinnan, Hayes &*

*Feldman, P.C.* (by *William A. Joselyn*), for For-
sythe Development Company.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by
*Paul W. Hines*), for Concrete Components, Inc.

RILEY, J.

### INTRODUCTION

This case involves three separate appeals result-
ing from a lawsuit brought by plaintiffs Nicholas
and Nancy Bosak for personal injuries suffered by
the former at a construction site accident. (Herein-
after, use of plaintiff in the singular will refer to
Nicholas Bosak.)

The general contractor on the construction proj-
ect was Forsythe Development Company (For-
sythe). Concrete Components, Incorporated (CCI),
plaintiff's employer, was a subcontractor on the
project, having been hired to supply and install
precast concrete slabs. CCI had rented from The
Hurley Corporation (Hurley) a crane and operator
to assist in the installation of the slabs. When the
crane arrived at the site, it was not completely
assembled. Plaintiff was injured on December 19,
1974, while the crane was being assembled, as the
crane operator "boomed down," causing plaintiff's
left hand to be pulled into a sheave through which
a cable, on which his hand was resting, ran. Four
fingers of plaintiff's left hand were severed.

Several issues are raised in this appeal, only six
of which we need address:

*Forsythe v Bosak*

(1) Did the Court of Appeals err in reversing the
trial court's grant of the general contractor's mo-
tion for directed verdict on the inherently danger-
ous activity theory?

*Forsythe v Concrete Components, Inc.*

(2) Assuming that the inherently dangerous theory of the general contractor's liability should have been submitted to the jury, should the general contractor's claim for common-law indemnity against plaintiff's employer have been allowed?

*Bosak v Hurley & Forsythe*

(3) Is the jury's damage award so clearly and grossly inadequate as to shock the judicial conscience and warrant additur?

(4) Did the evidence support instructing the jury on plaintiff's comparative negligence?

(5) Was the jury's finding that plaintiff was thirty percent negligent against the great weight of the evidence?

(6) Did the trial court erroneously refuse to instruct the jury to consider inflation in calculating its award of future damages?

*Hurley v Concrete Components, Inc.*

(7) Did the Court of Appeals err so as to require reversal in finding that the crane involved in plaintiff's accident was "nonoperational" and that, as a consequence, the indemnity agreement between the lessor and the lessee of the crane was unenforceable?

We reverse the decision of the Court of Appeals in two respects. First, we hold that the crane assembly operation was not an inherently dangerous activity (issue 1). That determination renders consideration of Forsythe's claim of indemnity against CCI (issue 2) unnecessary. Second, we remand this matter to the trial court to determine whether the crane was operational (issue 7). With respect to plaintiff's claims of error (issues 3 through 6), we affirm the decision of the Court of Appeals.

## PROCEDURAL HISTORY

Plaintiff and his wife filed suit against Forsythe, Hurley, and Robert Hutchinson, the crane operator.[1] Forsythe's liability was premised upon the dual theories that, as general contractor, it was actively negligent in directing that the crane be assembled under unsafe conditions and that it was responsible for the results of an inherently dangerous activity, *i.e.,* the crane assembly. Hurley's liability was premised upon the *respondeat superior* theory that the negligence of its employee caused the accident. Forsythe and Hurley, in turn, filed third-party claims for indemnity against CCI.

Hurley's indemnity claim was based on its lease agreement with CCI, which provided, in part, that it would be indemnified for injuries resulting from the "operation of the crane."

Prior to trial, the trial court granted summary judgment dismissing Hurley's claim against CCI for indemnification for any claims for personal injury arising out of work performed by Hurley for CCI. CCI's motion for summary judgment on Forsythe's claim for common-law indemnification was granted at trial.

At the close of the evidence, Forsythe moved for a directed verdict as to its liability. The trial court granted the motion insofar as it applied to the inherently dangerous activity theory, but denied it with respect to the theory of direct negligence on Forsythe's part.

The jury returned a verdict finding that Hurley was negligent, that its negligence was a proximate cause of the accident, that Forsythe was not negligent, that plaintiff suffered $100,000 in damages, that he was thirty percent comparatively negli-

---

[1] Hutchinson was dismissed with prejudice just prior to trial.

gent, and that plaintiff Nancy Bosak was entitled to damages in the amount of $10,000. Judgments were entered for Nicholas Bosak in the amount of $70,000 and for Nancy Bosak in the amount of $7,000.

Plaintiffs filed a post-trial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial or an order of additur. Plaintiffs argued, in part, that their theory of inherently dangerous activity on the part of Forsythe should have been submitted to the jury, that the damage award was inadequate, that the jury should not have been instructed on comparative negligence, and that its finding of plaintiff's negligence was against the great weight of the evidence. The motion was denied in all respects.

Plaintiffs appealed to the Court of Appeals, raising these same questions and also claiming error in the trial court's refusal to instruct on inflation. Forsythe and Hurley filed claims of appeal from the order granting cci's motions for summary judgment.

The appeals were consolidated by the Court of Appeals. Initially, the Court affirmed the trial court's judgments in all respects,[2] not reaching, however, Forsythe's claim of error.

Plaintiffs filed an application for rehearing, seeking reconsideration of the inherently dangerous activity question. On August 19, 1983, the Court of Appeals vacated its earlier decision and remanded the case for a new trial on plaintiffs' inherently dangerous activity theory.[3] Further, the Court of Appeals affirmed the grant of cci's motion for summary judgment on Forsythe's claim for common-law indemnification.

---

[2] *Bosak v Hutchinson,* unpublished opinion per curiam, released February 28, 1983 (Docket Nos. 57795, 60565, 60567).

[3] *Bosak v Hutchinson (On Rehearing),* unpublished opinion per curiam, released August 19, 1983 (Docket No. 60567).

Subsequently, Forsythe, Hurley, and plaintiffs applied to this Court for leave to appeal.

The facts will be detailed with the appropriate issues.

## ISSUE I

*Did the Court of Appeals err in reversing the trial court's grant of the general contractor's motion for directed verdict on the inherently dangerous activity theory?*

A. *Facts:*

Testimony established that the crane arrived at the worksite on the morning of December 19, 1974. Before it could be used, multiple sections of tubular steel had to be added to its base, and various cables had to be strung through the appropriate sheaves and attached to the ball.

The arrangements for assembly were the subject of dispute at trial and go to the heart of the lawsuit. Zolar Marus, CCI's field superintendent, recalled that Forsythe's on-site superintendent, Leonard Thompson, ordered the assembly to be done after regular working hours so that the assembly would not interfere with other work being done and the crane would be ready for the next day's work. Thompson, who at trial had no recollection of the conversation, testified that he would not have ordered the crane to be assembled after working hours and would not have objected to daytime assembly.

The crew which assisted crane operator Hutchinson consisted of three CCI employees: a "pusher" or foreman, Patrick Miller, and two ironworker apprentices, plaintiff and Keith Porter. Erection of the boom commenced sometime after 4:00 P.M. Testimony showed that the weather was cold and

wet and the site was muddy and slushy. There was evidence that there may have been some street lighting from the expressway near the site, that there could have been some lighting coming from the adjacent buildings, and that a security guard had parked his vehicle in such a manner that the lights shone along the boom. The record further reveals that neither the crane operator nor the crew, except for Porter, were concerned about the lighting conditions.

The erection of the boom progressed during increasingly diminishing light until it was completed. The crew then began hauling out the cables. The ironworkers got on the boom to carry the lines out toward the end. In order to steady themselves, they held onto the gantry line.

The operation of the boom was solely under Hutchinson's control. He testified that he would not operate the boom unless and until he had received a signal from the pusher (Miller).

Plaintiff believed that they were stringing a second cable when the accident occurred. He was the first one out on the boom, carrying the cable over his right shoulder and holding onto the gantry line with his left hand. Hutchinson testified that at the time of the accident Miller was standing outside the cab, approximately two or three feet from him, giving the signals. Miller did not believe that he was that close to Hutchinson. What occurred at that moment was the subject of controversy at trial. It was not disputed, however, that Hutchinson activated the gantry line which moved and pulled plaintiff's left hand into the sheave. Hutchinson testified that although Miller had been signaling by hand until just before the accident, Miller verbally signaled for Hutchinson to boom down. Miller contended that he did not give any verbal signal and that no hand signals

were made at this point. Neither Porter nor plaintiff heard Miller signal.

B. *Disposition in the Trial Court and the Court of Appeals*

The trial court and the Court of Appeals have analyzed this issue in various ways. The trial court granted Forsythe's motion for directed verdict with regard to plaintiff's inherently dangerous activity theory. This ruling was based on the trial court's findings that (1) Forsythe had not contracted with CCI to erect the crane at night, and (2) CCI's decision, subsequent to the contract, to erect the crane without adequate lighting amounted to collateral negligence as defined in 2 Restatement Torts, 2d, § 426, p 413.

Initially, the Court of Appeals affirmed the grant of directed verdict, although on a different basis:

> Even assuming the assembly of a crane could be found to be an inherently dangerous activity, the proofs submitted by plaintiffs show that *the injuries sustained* by Nicholas Bosak *were* not *due* to the inherently hazardous nature of the work, but rather to *the collateral negligence of the crane operator.* See *Garczynski v Darin & Armstrong Co,* 420 F2d 941, 942 (CA 6, 1970).
>
> The negligence involved here is solely the negligence of the crane operator in "booming down" when he had apparently received no order to do so. On a properly operated crane, this risk is not inherent or normal to the work, and defendant Forsythe certainly had no reason to contemplate the Hurley employee's negligence when the contract with CCI was made. [Emphasis added.]

However, on rehearing, the Court of Appeals concluded that the case should have been submitted to the jury:

> After again reviewing the record we believe that

the evidence raised a question of fact, for the jury, as to whether plaintiff's injuries were due solely to the collateral negligence of the crane operator or whether the accident could be attributable to both the crane operator's negligence and the actions of the general contractor. Forsythe allegedly directed the work to be done after normal working hours, on a mid-winter evening in muddy, snowy, winter-weather conditions by workers who had already worked a full day on the construction site. Whether these conditions contributed to the accident is a determination which should be left to the trier of fact; the foreseeable circumstances and consequences of night-time crane-assembly in mid-December were sufficient to present to the jury the inherently dangerous activity theory of liability.

## C. *Analysis*

The inherently dangerous activity doctrine is an exception to the general rule that an employer of an independent contractor is not liable for the contractor's negligence or the negligence of his employees. 2 Restatement Torts, 2d, § 409, p 370; 41 Am Jur 2d, Independent Contractors, § 41, p 805.

Michigan has recognized the exception for activities which reasonably can be foreseen as dangerous to third parties,[4] and has, on occasion, allowed the doctrine to be applied to employees of the contractor performing the dangerous work. *McDonough v General Motors Corp,* 388 Mich 430; 201 NW2d 609 (1972); *Vannoy v City of Warren,* 15 Mich App 158; 166 NW2d 486 (1968), *lv den* 382 Mich 768 (1969).

The doctrine was first recognized in Michigan in

---

[4] *Grinnell v Carbide & Carbon Chemicals Corp,* 282 Mich 509; 276 NW 535 (1937); *Watkins v Gabriel Steel Co,* 260 Mich 692; 245 NW 801 (1932); *Wight v H G Christman Co,* 244 Mich 208; 221 NW 314 (1928); *Olah v Katz,* 234 Mich 112; 207 NW 892 (1926); *Inglis v Millersburg Driving Ass'n,* 169 Mich 311; 136 NW 443 (1912).

*Inglis v Millersburg Driving Ass'n,* 169 Mich 311; 136 NW 443 (1912). In that case, the plaintiff's land and timber were damaged when fire, which had been set by a contractor employed by the defendant to clear the defendant's land, spread to plaintiff's adjoining land. In reversing a directed verdict for the defendant which was based on its contention that it could not be held liable for the contractor's actions, this Court noted that the defendant had been notified of the danger of setting fires. Taking judicial notice of the fact that the season had been unusually dry, the Court held that an employer of an independent contractor cannot avoid liability for

> work necessarily involving danger to others, unless great care is used, to make such provision against negligence as may be commensurate with the obvious danger. [*Inglis, supra,* 321.]

Further, the Court concluded that

> [t]here was a condition of great danger caused by an unprecedented drought, apparent to every one, cautions and warnings had been given, yet no precautions were required or enforced, in fact, defendants acted in permitting these fires to be set with utter disregard of consequences, which, under the conditions, naturally resulted from such conduct. [*Inglis, supra,* 322.]

The rule as stated in *Inglis* has been followed in subsequent cases. *McDonough, supra; Utley v Taylor & Gaskin, Inc,* 305 Mich 561; 9 NW2d 842 (1943); *Grinnell v Carbide & Carbon Chemicals Corp,* 282 Mich 509; 276 NW 535 (1937); *Watkins v Gabriel Steel Co,* 260 Mich 692; 245 NW 801 (1932); *Wight v H G Christman Co,* 244 Mich 208; 221 NW 314 (1928); *Brown v Unit Products Corp,*

105 Mich App 141; 306 NW2d 425 (1981), *rev'd after remand on other grounds* 123 Mich App 157; 333 NW2d 204 (1983); *Huntley v Motor Wheel Corp,* 31 Mich App 385; 188 NW2d 5 (1971), *lv den* 387 Mich 761 (1972); *Vannoy, supra.* The *Vannoy* Court described the doctrine as "closely akin to, but not exactly the same as, strict liability." *Vannoy, supra,* 163.

The Restatement of Torts, 2d, defines inherently dangerous activity in two sections, § 416 and § 427, which, according to Comment *a* to § 416, overlap. Section 416 refers to "peculiar risk":

> One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise. [2 Restatement Torts, 2d, § 416, p 395.]

Section 427 refers to "special danger":

> One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger. [2 Restatement Torts, 2d, § 427, p 415.]

The above definitions were cited by the *McDonough* Court and were relied on by the Court of Appeals in *Bradford v General Motors Corp,* 123

Mich App 641; 333 NW2d 109 (1983), *lv den* 417 Mich 1100.16 (1983).

In *McDonough, supra,* the plaintiff's decedent was an ironworker employee of a contractor (Paragon) engaged by the defendant (General Motors) to erect the structural steel framework for an additional floor which was to be built above the existing plant. Paragon had installed steel trusses as a part of the structure. The plaintiff's decedent was standing on one of the trusses when the accident occurred. A derrick, owned by Paragon, which was to be used to lift steel beams, had just been erected. As the crew, of which the plaintiff's decedent was a member, was tying the boom of the derrick to a permanent truss in order to secure it for the night, the boom fell on the decedent as a result of either careless operation of the derrick or faulty installation of the boom cable.

The *McDonough* case produced four opinions, none of which had more than one co-signer. A majority of the justices did, however, seem to agree on the construction of the inherently dangerous activity doctrine, which construction was based on the *Inglis* rule.

The per curiam opinion concluded that the evidence supported submitting the question to the jury under the *Inglis* rule, as "the job called for by this contract had to be performed with 'great care' lest employees—not only of Paragon but of Chevrolet workmen below—be or become endangered by such performance." *McDonough, supra,* 440.

Having examined these various definitions of what constitutes an inherently dangerous activity, it is apparent that an employer is liable for harm resulting from work "necessarily involving danger to others, unless great care is used" to prevent injury, *Inglis, supra,* 331, or where the work involves a "peculiar risk" or "special danger" which

calls for "special" or "reasonable" precautions. 2 Restatement Torts, 2d, §§ 416, 427. It must be emphasized, however, that the risk or danger must be "recognizable in advance," *i.e.,* at the time the contract is made, for the doctrine to be invoked. Thus, liability should not be imposed where a new risk is created in the performance of the work which was not reasonably contemplated at the time of the contract.[5] This concept is the key to the resolution of the instant case. Our examination of the evidence and inferences that may be drawn therefrom, even when viewed most favorably to plaintiffs, persuades us that reasonable minds would conclude that the activity at issue was not inherently dangerous.

We note that the parties disagree as to what *is* the activity which is submitted to be inherently dangerous. Plaintiffs argue that the activity was nighttime, midwinter crane assembly. At oral argument, they claimed that while assembling a crane in the daytime might be a commonplace, innocuous activity, Forsythe's directing that the assembly be done at night resulted in the activity

---

[5] Section 426 of the Restatement Torts, 2d, sets forth this principle:

"Except as stated in §§ 428 and 429, an employer of an independent contractor, unless he is himself negligent, is not liable for physical harm caused by any negligence of the contractor if

"(a) the contractor's negligence consists solely in the improper manner in which he does the work, and

"(b) it creates a risk of such harm which is not inherent in or normal to the work, and

"(c) the employer had *no* reason to contemplate the contractor's negligence when the contract was made." 2 Restatement Torts, 2d, § 426, p 413.

See, also, 2 Restatement Torts, 2d, § 427, comment *d,* p 417. The *Inglis* Court suggested that this exception is viable:

"It [liability based on the inherently dangerous activity theory] is not applied to those cases where the injuries occur which are collateral to the employment, like the dropping of material by the servant of a contractor upon a person passing by . . . ." *Inglis, supra,* 321.

We recognize that the per curiam opinion in *McDonough, supra,* "expressly reserved" the question of the application of this exception.

taking on a peculiar risk for which special precautions were necessary. Forsythe responds that the activity was crane assembly and that the weather and lighting conditions had nothing to do with the accident.

Comments *b* and *c* to § 427 of the Restatement set forth above, might be read as supporting plaintiffs' argument:

> b . . . It is sufficient that work of any kind involves a risk, recognizable in advance, of physical harm to others . . . that the employer has special reason to contemplate such a risk under the particular circumstances under which the work is to be done.
>
> c . . . The rule applies equally to work which, although not highly dangerous, involves a risk recognizable in advance that danger inherent in the work itself, or in the . . . prescribed way of doing it, may cause harm to others.

In this case, however, there is no evidence that "the particular circumstances under which the work [was] done" or the "prescribed way of doing" the work created "a risk, *recognizable in advance,* of physical harm to others." § 427, *supra.* (Emphasis added.) Further, there appears to be no record evidence that Forsythe, the general contractor, was aware at the time of entering into the contract with CCI of the need to erect the crane on site or that it was anticipated that the erection was to be done at night. Rather, the evidence suggests to the contrary, that it was a fairly routine job as construction jobs go and that the dangerous activity was doing such a job with inadequate lighting, not the erection of the crane per se.

The doctrinal thread that runs through Michigan case law, which we reaffirm today, is the definition enumerated in *Vannoy, supra,* that the

inherently dangerous doctrine is something akin to a theory of strict liability.[6] Given this definition, we decline to drift toward a standard that would permit collateral negligence to elevate normal activity into inherently dangerous activity. On this record, we cannot say that the construction of a crane at a construction site presents a peculiar risk (2 Restatement Torts, 2d, § 416) or special danger (2 Restatement Torts, 2d, § 427) or, as is argued, an inherently dangerous activity.

Therefore, we reverse the judgment of the Court of Appeals on rehearing granting plaintiffs a new trial, and we affirm the trial court's denial of plaintiffs' motion for a new trial. Our treatment of this issue renders moot the second issue raised herein.

## Issue III

*Is the jury's damage award so clearly and grossly inadequate as to shock the judicial conscience and warrant additur?*

Plaintiff contends that the trial court erred in denying his motion for additur or in the alternative a new trial when his lost past wages alone exceeded the jury verdict.

---

[6] The question whether liability for inherently dangerous activity is vicarious (passive) or active negligence for purposes of determining common-law indemnification claims has split the *Court of Appeals*. Compare, *e.g., Nanasi v General Motors Corp*, 56 Mich App 652; 224 NW2d 914 (1974), with *Duhame v Kaiser Engineering of Michigan, Inc,* 102 Mich App 68; 300 NW2d 737 (1980), lv den 411 Mich 955 (1981). In likening the inherently dangerous activity doctrine to strict liability, we do not suggest that liability based on the inherently dangerous activity theory involves only passive or vicarious negligence, so that the employer is automatically entitled to common-law indemnification from the contractor. We specifically do not decide whether liability for inherently dangerous activity involves active or passive negligence for purposes of determining common-law indemnification claims.

GCR 1963, 527.1(4)[7] provided that a new trial may be granted where the verdict "is clearly or grossly inadequate . . . ."

GCR 1963, 527.6,[8] which governs remittitur and additur, provided:

> When a finding is made that the only error in the trial is the inadequacy or excessiveness of the verdict, the court may deny a motion for new trial on condition that within 10 days the non-moving party consents in writing to the entry of judgment of an amount found by the judge to be the lowest or highest amount respectively which the evidence will support.

The decision to grant a new trial is a matter within the trial court's discretion and this Court will not interfere unless the abuse of that discretion is palpable. *Moore v Spangler,* 401 Mich 360, 372; 258 NW2d 34 (1977). Great deference is given to the decision of the trier of fact who has heard and observed the testimony. In *Precopio v Detroit,* 415 Mich 457, 465; 330 NW2d 802 (1982), this Court noted:

> In reviewing damage awards in cases tried to juries, this Court has asked whether the award shocks the judicial conscience, appears unsupported by the proofs, or seems to be the product of improper methods, passion, caprice, or prejudice; if the amount awarded falls reasonably within the range of evidence and within the limits of what reasonable minds would deem just compensation for the injury sustained, the verdict has not been disturbed.

We, then, must determine whether the jury

---

[7] New MCR 2.611(A)(1)(d) is substantially the same as former court rule GCR 1963, 527.1(4).

[8] New MCR 2.611(E)(1) is substantially the same as former court rule GCR 1963, 527.6.

verdict of $100,000 was either shocking to the judicial conscience, or beyond the proofs, or secured by improper methods, prejudice, caprice, or passion. See *Precopio, supra,* pp 465-466, n 11, and cases cited therein.

Plaintiff correctly states the rule that where a jury verdict ignores the uncontroverted out-of-pocket expenses of the plaintiff, such verdict is inadequate and must be reversed. *Zielinski v Harris,* 289 Mich 381; 286 NW 654 (1939); *Walker v Britton,* 193 Mich 174; 159 NW 150 (1916); *Cooper v Christensen,* 29 Mich App 181; 185 NW2d 97 (1970); *Hugener v Michlap,* 2 Mich App 157; 139 NW2d 132 (1966).

The instant case differs, however, from those just cited in that here the amount of plaintiff's out-of-pocket expenses was controverted.

Plaintiff relies on the following evidence in support of his claim that he is unable to return to ironwork. At the time of the accident, plaintiff was within two months of completing his ironworking apprenticeship. He testified that after his accident he tried to complete the apprenticeship program but failed because, with only one hand, he could not pass the welding course.

At the time of the accident, plaintiff was working full-time, averaging forty hours per week, and earning $10.0358 per hour. Plaintiff presented testimony concerning the wages he would have earned had he completed his apprenticeship and worked forty hours per week, fifty-two weeks per year, for the years 1975 through June, 1981.[9]

---

[9] The secretary-bookkeeper of the ironworkers union testified to the following pay scales mandated by ironworker contracts:

| Gross Hourly Wages | Period |
| --- | --- |
| $10.0358 | As of December 1974 |
| 12.5517 | January 1975—May 1976 |
| 14.4977 | June 1976—May 1977 |
| 15.0120 | June 1977—November 1977 |

Plaintiff testified that his actual earnings for the period between the accident and trial were approximately $35,000. Comparing his actual earnings and projected ironworking earnings, plaintiff claims he sustained out-of-pocket losses of approximately $180,000.

That claim, however, is predicated on the assumption that plaintiff could not have returned to ironwork. The testimony on this question was disputed. While plaintiff did testify that he could not do the welding required to complete his apprenticeship, he also testified that he did not return to ironwork because he believed he might endanger the safety of himself and others, and also because his wife would be worried about his safety.

Further, the governing board for the ironworkers' union permitted plaintiff to continue the apprenticeship, apparently aware of the nature and extent of his injury, giving rise to the possible inference that he could return to ironwork.

There was no testimony from anyone other than plaintiff about his inability to complete his apprenticeship. Moreover, George Falls, the former vice president of CCI, testified that he wrote a letter to plaintiff in January, 1976, stating his understanding that plaintiff was ready to resume work and should contact Falls to make arrangements for his return to work. To Falls' knowledge, plaintiff never responded. Falls testified that he would hire plaintiff as an ironworker on the basis of the availability of work.

Thus, the conflicting testimony as to whether plaintiff could have returned to ironwork put in

| | |
|---|---|
| 15.5402 | December 1977—May 1978 |
| 16.7804 | June 1978—May 1979 |
| 18.1229 | June 1979—May 1980 |
| 20.0258 | June 1980—May 1981 |

dispute the amount of plaintiff's out-of-pocket expenses. As Forsythe and Hurley argue, the jury could have believed that plaintiff could have returned to work in January, 1976, but that he voluntarily chose not to return. Lost ironworker wages for the period December 19, 1974 through January 1, 1976, would have been $26,908, using a fifty-two week work year.[10]

A similar situation was presented in *Moyer v Shampo*, 357 Mich 391; 98 NW2d 631 (1959). In that case, the plaintiff had testified that his injuries had prevented him from returning to work for an extended period of time. The defendant maintained that the plaintiff was able to resume his work after six weeks. This Court affirmed the denial of the plaintiff's motion for new trial which, like the instant case, was based on the claim that the verdict was inadequate:

> The jury might have found that plaintiff's earning capacity was impaired only during the 6 weeks following the accident. Such a conclusion would not have been contrary to the great weight of the evidence: plaintiff did indeed return to work at the end of that period. The jury thus might have found a loss of 6 weeks' earnings at the testified rate of $98.40 per week, awarding such sum, together with $500 or $600 to compensate for pain and suffering. Such amount would be within the reasonable discretion of the jury. See *Sebring v Mawby*, 251 Mich 628 [232 NW 194 (1930)].
>
> We do not wish to suggest that the testimony necessitates such findings or that we are assured of the probability that they were made. Judicial review does not involve such conjecture. We must be satisfied merely that a basis for the verdict of the jury may be found in a sound evaluation of the evidence. And we are so satisfied. [*Moyer, supra,* 393-394.]

[10] There was also testimony that ironworkers averaged forty-week work years.

See, also, *Moore, supra,* 375-379.

Next, plaintiff argues that the trial court erred in denying his motion for a new trial or additur because "the jury's award does not include any amount for loss of future earnings, pain and suffering, mental anguish, loss of social pleasure and enjoyment, embarrassment, etc." He relies on *Cooper, supra, Mosley v Dati,* 363 Mich 690; 110 NW2d 637 (1961), *Fordon v Bender,* 363 Mich 124; 108 NW2d 896 (1961), and *Weller v Mancha,* 353 Mich 189; 91 NW2d 352 (1958), where the jury awards which ignored pain and suffering were found inadequate.

In the instant case, it is not disputed that plaintiff proved that he experienced pain and suffering. He suffered the traumatic amputation of four fingers of his left hand. Reattachment of the severed fingers was not possible, and a skin graft was performed. He underwent unsuccessful surgery to widen the grasp of the hand. Plaintiff took pain medication for three months, and testified that he still experienced occasional pain. However, his doctor testified that plaintiff had tolerated his injury as well as any patient he had treated and that on the last visit had no complaints of serious pain. Plaintiff further testified that he was embarrassed over the appearance of his hand, that it was tender and sensitive to cold, that he was somewhat limited in his activities, but still participated as best he could in hobbies and athletics.

Nevertheless, contrary to the facts in the instant matter, in all of the cases relied upon by plaintiff, the verdicts were less than, or equal to, the amounts of uncontroverted out-of-pocket expenses, indicating that the juries failed to consider pain and suffering. Thus, we find this case distinguishable. On this record, it simply cannot be said that the jury awarded the full verdict of $100,000 as

compensation for lost wages to the exclusion of the other types of damages claimed.

The plaintiff in *Moore, supra,* 380, made a similar argument, which this Court rejected:

> Plaintiff bases her contention that the jury "could not have considered" her alleged pain and suffering in reaching its verdict on two erroneous assumptions: (1) that her out-of-pocket expenses were uncontroverted; (2) that "since the jury did not even consider all the uncontroverted out-of-pocket expenses, it could not have considered the plaintiff's pain and suffering . . . ." Since we have found plaintiff's first assumption unsupported by the evidence and her second assumption to be too speculative and conjectural to warrant consideration, the conclusion is inescapable that plaintiff's argument that the jury ignored her alleged pain and suffering is conjectural at best.

Further, we note that there is no absolute standard by which to measure awards for personal injury and that such awards, particularly those for pain and suffering, rest within the sound judgment of the trier of fact. *Precopio, supra,* 464-465.

Therefore, we conclude that the Court of Appeals properly affirmed the trial court's denial of plaintiff's motion for additur or a new trial.

## ISSUE IV

*Did the evidence support instructing the jury on plaintiff's comparative negligence?*

## ISSUE V

*Was the jury's finding that plaintiff was thirty percent negligent against the great weight of the evidence?*

Plaintiff's next assertions of error concern the

question of his comparative negligence. He first argues that the trial court erred in instructing the jury on his comparative negligence because the evidence did not support such an instruction, and, second, that the jury's finding that he was thirty percent comparatively negligent was against the great weight of the evidence.

We consider Issue V first.

The grant or denial of a motion for new trial on the ground that the verdict is against the great weight of the evidence rests within the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal unless a clear abuse is shown. *Termaat v Bohn Aluminum & Brass Co,* 362 Mich 598; 107 NW2d 783 (1961); *Murchie v Standard Oil Co,* 355 Mich 550; 94 NW2d 799 (1959); *Murphy v Sobel,* 66 Mich App 122; 238 NW2d 547 (1975).

Judicial discretion has been variously defined. Compare *Langnes v Green,* 282 US 531, 541; 51 S Ct 243; 75 L Ed 520 (1931), with *Spalding v Spalding,* 355 Mich 382; 94 NW2d 810 (1959).

In his concurring opinion in *People v Talley,* 410 Mich 378, 399; 301 NW2d 809 (1981), Justice Levin wrote:

> Thus when a question of abuse of discretion is properly framed, it is incumbent upon a reviewing court to engage in an in-depth analysis of the record on appeal. This Court has, in spite of references to *Spalding, [supra],* continued to give full-fledged review to discretionary decisions by carefully weighing the various rights and considerations involved in each type of discretionary decisions.

Our analysis of the record in this case leads us to conclude that no abuse of discretion occurred.

On the night of the accident, plaintiff and his co-

worker, Keith Porter, were erecting the crane's
boom under the supervision of their foreman, Pat-
rick Miller. Just prior to the accident, plaintiff and
Porter were carrying a cable over their right
shoulders while walking along the boom. To sup-
port themselves, plaintiff and Porter held onto a
gantry line which had already been strung. While
plaintiff grasped the line near a sheave, the line
was released and his left hand was pulled into the
sheave, causing his injury. Porter testified that he
felt the gantry line move just before plaintiff
screamed. The crucial question was whether plain-
tiff violated his duty to use ordinary care for his
own safety and was negligent in placing his hand
on the gantry line.

The crane operator (Hutchinson), who was not
an ironworker but had worked with cranes and
ironworkers for many years, testified that it was
not appropriate for ironworkers to place their
hands on gantry lines for support. According to
him, it was the accepted practice for ironworkers
to support themselves by holding onto the back
boom stoop or "hog rods."

The Court of Appeals placed great reliance on
Hutchinson's testimony in affirming the trial
court. Plaintiff presents two arguments as to why
this was erroneous.

Plaintiff argues:

> First of all, the crane assembly job performed by
> Plaintiff and the rest of the three-man ironworker
> crew was quite obviously an ironworker job and
> any expertise would reasonably be expected to lie
> within that trade. Plaintiff's own foreman, an
> extremely experienced ironworker, was totally
> supportive of Plaintiff's conduct or job perfor-
> mance at the time of the accident. Moreover, all of
> the ironworker testimony (Miller, Porter, and
> Plaintiff Bosak) indicated the correctness of the

procedure employed by Plaintiff in rigging the crane.

A close reading of the testimony, however, belies this argument. It is true that Porter testified that he too was holding onto the gantry line at the time of the accident. Further, Marus testified that there was nothing unusual about ironworkers holding onto gantry lines for support, and plaintiff himself testified to having done so in the past and having seen others do the same. Also, Miller, the foreman, testified:

> *Q.* [*Attorney for plaintiffs*]: Mr. Miller, as a journeyman of 35 years of experience, did you know of anything wrong with having Nick Bosak hold that cable on one shoulder and use that gantry line for support?
> *A.* [*Mr. Miller*]: I'd do the same thing.

However, Mr. Miller also testified:

> *Q.* [*Attorney for defendant Hurley*]: Is it customery [*sic*], is that what you are telling us?
> *A.* [*Mr. Miller*]: Yeah, yeah.
> *Q.* Is that the way you were trained?
> *A.* Yeah.
> *Q.* To hold on to that boom line?
> *A.* Yeah.
> *Q.* When you get near the floating harness, what do you then hold on to?
> *A.* Well, you don't have to hold on to nothing but if there is something there, I don't know why, we just automatically grab a hold of it.
> *Q.* Would you make an attempt not to hold a cable right next to a sheave?
> *A.* Well, yeah.
> *Q.* Why is that?
> *A. Well, because you know if you get into one of those sheaves, it's tragedy.* [Emphasis added.]

Thus, the testimony suggests that although holding onto a gantry line might be proper in some circumstances, holding onto a line close to a sheave might be improper. Contributory negligence depends upon the circumstances, *Jaworski v Great Scott Supermarkets, Inc,* 403 Mich 689; 272 NW2d 518 (1978); 57 Am Jur 2d, Negligence, § 295, p 692. We are not persuaded that the record conclusively established "the correctness of the procedure employed by Plaintiff."

Plaintiff next argues that Hutchinson's testimony was "inherently unreliable and incapable of being believed" because of testimony that Hutchinson admitted "fault" immediately following the accident. We note that at trial Hutchinson denied that he was at fault, explaining that he "probably would have said anything" to comfort plaintiff at the time. In any event, determination of credibility is within the province of the factfinder; an appellate court will not grant a new trial simply because the court may have drawn different inferences from the evidence, resolved conflicting testimony in a different way, reached a different conclusion on credibility, or even preferred a different decision as between permissible alternatives. *Thoms v Diamond,* 131 Mich App 108; 346 NW2d 69 (1983), *lv den* 419 Mich 904 (1984).

Plaintiff further argues that because he, as an apprentice, was merely following the orders of his foreman in stringing the cable, he was incapable of being found personally negligent. There is no evidence that Miller "ordered" plaintiff to hold onto the gantry line for support; in fact, it is likely that Miller would not have done so in light of his testimony that doing so could be a "tragedy." Even assuming that Miller actually ordered plaintiff, either verbally or by example, to grasp the gantry line near the sheave, plaintiff is chargeable with

the duty to guard his own safety. Plaintiff, well through his three years of apprenticeship, had participated in erecting crane booms before, and Miller testified that plaintiff seemed to know what he was doing.

Plaintiff also argues that his grasping a gantry line near a sheave only became dangerous because Hutchinson negligently "boomed down" the crane while men were standing on it and that he cannot be held liable for failing to foresee and protect himself against the negligence of another. Testimony indicated however, that "booming down" with men standing on the boom was a common practice. Thus, the jury could have found that the possibility of the boom moving was foreseeable.

Finally, it is clear that it was proper to instruct the jury on the issue of plaintiff's comparative negligence. The presence of the above-noted evidence on the question distinguishes this case from those relied upon by plaintiff[11] where error was found because the trial court submitted to the jury an instruction on an issue not sustained by the evidence.

ISSUE VI

*Did the trial court erroneously refuse to instruct the jury to consider inflation in calculating its award of future damages?*

Plaintiffs requested that the trial court instruct the jury that it should consider the effect of inflation when calculating plaintiffs' future damages. Plaintiffs claimed that such an instruction would balance SJI 34:03 (reduction of future damages to present value, now SJI2d 53.03). They asked the

---

[11] See, *e.g., Jaworski v Great Scott Supermarkets, Inc,* 403 Mich 689; 272 NW2d 518 (1978).

court to take judicial notice of the rise in the Consumer Price Index in formulating an inflation instruction.

The trial court refused to give an inflation instruction:

> With regard to the other arguments, this Court will not give any instruction with regard to inflation. I don't think that is an appropriate instruction and there are too many variables that can come into play and certainly this Court is not satisfied there is sufficient data to justify comments about inflation coming from the lips of the Court which some people think carry more weight than coming from the attorneys. So, the Court will not give an instruction on inflation.

The Court of Appeals affirmed the decision of the trial court:

> Under the circumstances of this case, we decline to find the trial court's refusal to instruct the jury that it must consider inflation to be improper. Plaintiffs introduced no testimony regarding the present or future rate of inflation. While the existence of inflation may have become "a fact of present-day life," *Tiffany* [*v The Christman Co*, 93 Mich App 267, 280; 287 NW2d 199 (1979)], the existence and rate of inflation in the future is simply not a matter of which a trial court may take judicial notice and attempt to properly and fairly instruct the jury thereon.

Recently, courts of many jurisdictions have expressed the view that expected inflation in the value of money is properly considered by the trier of fact in calculating damages for future losses. See Anno: *Effect of anticipated inflation on damages for future losses—Modern cases*, 21 ALR4th 21. Disagreement exists, however, concerning the

proper method of determining an award for lost earnings in an inflationary economy.

Michigan cases have agreed that inflation may be considered,[12] but none has considered the precise question involved here—whether the trial court, when requested, must instruct the jury that it should consider inflation in calculating damages where there has been no testimony of the present or projected future rate of inflation.

The first Michigan case was *Normand v Thomas Theatre Corp,* 349 Mich 50; 84 NW2d 451 (1957), which referred to inflation in the context of the defendant's claim that the verdict was excessive. The jury had awarded $10,000, of which $804.50 was represented by expenses, to the plaintiff who had sustained a leg injury which left a 3-1/2 inch-long scar below her knee and sustained a partial loss of supination of the right hand and forearm resulting from a fracture of the radius at the elbow. In upholding the award of damages, this Court wrote:

> It is said that this is too much, shockingly so. We find it appropriate in the way of answer to say that the jury was entitled to take into account the reduced value of today's dollar in making its criticized assessment, and that what might in the past have been excessive is not on the same facts necessarily exorbitant today. Judged in such light, we cannot say that this verdict is excessive.
>
> On the very day of this writing (July 15, 1957), the Detroit Free Press observed editorially something this Court may and should judicially notice: "and the pace of inflation has been stepped up from a crawl to a trot." In 1950 the editorial writers of American Law Reports prepared an exhaustive brief entitled "Changes in cost of living or in purchasing power of money as affecting

[12] See *Tiffany, supra; Kovacs v Chesapeake & Ohio R Co,* 134 Mich App 514; 351 NW2d 581 (1984), *lv gtd* 422 Mich 974 (1985).

damages for personal injuries or death" (12 ALR2d 611). (They might well prepare another, bringing 1950 into comparative array with the Free Press' characterization of 1957.) In such annotation it is shown that the courts of this country are generally agreed that judicial review of verdicts in personal injury cases should take into account the fact that a change has taken place in the purchasing power of money, and in the cost of living, which of right may be reflected in damage awards; further, that such economic developments are so much a matter of common knowledge that judges and juries are entitled to consider them although not expressly proven in evidence (Compare *Palmer v Security Trust Co,* 242 Mich 163 [218 NW2d 677 (1928)] [60 ALR 1392] with *Graham v United Trucking Service, Inc,* 327 Mich 694, 706 [42 NW2d 848 (1950)]). [*Normand, supra,* 61, 62.]

Plaintiffs urge:

The *Normand* decision is noteworthy in that it sets forth two important propositions. First, it affirmatively states that a jury can consider the effect inflation has on reducing the purchasing power of money; and second, it expressly concludes that inflation is of such common knowledge that judicial notice may be taken of it.

We believe plaintiffs read *Normand* too broadly. As the Court of Appeals wrote in *Freeman v Lanning Corp,* 61 Mich App 527, 531; 233 NW2d 68 (1975):

*Normand* and cases like it stand only for the principle that courts need not be bound by the size of past awards in determining whether a current award is excessive. Rather they may take note of rising prices due to past inflation in order to justify large verdicts against a charge of excessiveness. See *Williams v United States,* 435 F2d 804, 807 (CA 1, 1970).

In *Freeman,* the trial court had not reduced the damages to their present value. The plaintiff in *Freeman* argued that the failure to reduce the present value was rendered harmless by inflation, claiming that, according to *Normand,* the trial court was entitled to take judicial notice of the effect of inflation and that the court took account of such effects. The court rejected the argument and remanded the case for a recomputation of damages. Similarly, in *McKee v Dep't of Transportation,* 132 Mich App 714, 727-729; 349 NW2d 798 (1984), the Court remanded for reduction of the damage award to present value. In *McKee,* the trial court's opinion had stated that "any normal reduction to present value is offset by inflation." *Id.,* p 729.

Plaintiffs seize on the remark in *McKee* that

[n]o finding was made as to the current inflation rate to *illustrate that this was indeed the case.*[19]

---

[19] See *Tiffany v The Christman Co,* 93 Mich App 267, 280; 287 NW2d 199 (1979). [Emphasis added.]

---

Plaintiffs go on to argue:

The clear inference to be drawn from *McKee* is that, if the Court had made such a finding, rather than simply making blanket statements and assumptions, the Court of Appeals would have upheld the trial judge's consideration of inflation.

We do not believe that this conclusion is mandated. *McKee* differs from *Tiffany* in that the *Tiffany* jury, unlike *McKee,* was instructed to reduce damages to present value. *Tiffany,* 287. Therefore, even if there had been a finding as to the current inflation rate in *McKee,* as there was

in *Tiffany,*[13] the error for failure to reduce to present value still would have existed.

Further, we note that in this case no testimony was presented as to current or future rates of inflation. Relying on *Feldman v Allegheny Airlines, Inc,* 382 F Supp 1271, 1293-1294 (D Conn, 1974), and *Pierce v New York Central R Co,* 304 F Supp 44, 45 (WD Mich, 1969), for the proposition that courts can take judicial notice of statistics compiled by the Bureau of Labor Statistics of the United States Department of Labor, plaintiffs submit that they "offer[ed] the monthly labor reviews from the Department of Labor, from the year 1967 forward, to the judge for his review." In *Feldman* and *Pierce,* however, unlike this case, there was expert testimony on the subject, in addition to the judicially noticed data.

The only Michigan case to affirm a jury instruction on inflation is *Kovacs v Chesapeake & Ohio R Co,* 134 Mich App 514; 351 NW2d 581 (1984), *lv gtd* 422 Mich 974 (1985).

There, without analysis, the Court of Appeals affirmed the following instruction, finding that it "was not contrary to any law of damages in Michigan":

> "You jurors may, in considering the reduction of the verdict rendered in this matter to its present worth, further consider the effect of inflation on the reduction to present worth and the amount of damages which you find the plaintiffs have suffered.
>
> "It is for you to determine from the evidence whether in determining damages, the damage should be reduced to the value of today's dollar due to the changes taking place in the purchasing

---

[13] In *Tiffany,* the Court of Appeals affirmed the trial court's admission of expert testimony on future lost wages which projected an annual 3½ percent wage increase as a reflection of inflation.

power of money and the cost of living as well as inflationary forces." [*Id.,* pp 534-535.]

Plaintiffs have not provided us with the requested instruction. The transcript of the argument on the instruction, however, indicates that plaintiffs sought to include a specific rate (thirteen percent) of inflation. Thus, the instruction differs from the *Kovacs* instruction, which was of a general nature.

We do not read *Kovacs* as mandating the type of instruction requested in this case. In light of the lack of testimony on the subject, we believe the trial judge properly declined to give the instruction. Moreover, we note that the trial judge permitted, and plaintiffs' counsel made, extensive argument on the fact and effect of inflation. And, the jury was free to apply its common knowledge of and experience with inflation in fashioning the award.[14]

## Issue VII

*Did the Court of Appeals err so as to require reversal in finding that the crane involved in plaintiff's accident was "non-operational" and that, as a consequence, the indemnity agreement between the lessor and the lessee of the crane was unenforceable?*

Hurley filed a third-party complaint against CCI for indemnity based in part on the lease agreement for CCI's rental of the crane from Hurley. That agreement provided *inter alia* that "[l]essee assumes all responsibility for loss, damage and expense resulting from the operation of the above equipment either personal injury or property damage . . . ."

[14] See *Bach v Penn Central Transportation Co,* 502 F2d 1117 (CA 6, 1976).

Prior to trial, cci moved for summary judgment on Hurley's claim for contractual indemnity.[15] In its brief in support of the motion, cci relied on *Darin & Armstrong v Ben Agree Co*, 88 Mich App 128; 276 NW2d 869 (1979), *lv den* 406 Mich 1007 (1979), and stated that "[i]t would be against public policy to coerce Concrete Components [cci] to indemnify Hurley for damages caused by Hurley's own neglect." In dicta, the Court of Appeals stated in *Darin & Armstrong*, p 136:

> Even if the contractual provision could be read, in light of surrounding circumstances, as indemnifying Darin & Armstrong against its own negligence, the provision would be void as against public policy. MCL 691.991; MSA 26.1146(1); *Ford v Clark Equipment Co*, 87 Mich App 270; 274 NW2d 33 (1978). Nor could the provision be utilized to indemnify Darin & Armstrong for its concurrent negligence; this would be akin to contribution, which is forbidden by Michigan courts where workers' compensation is involved. *Husted* [*v Consumers Power Co*, 376 Mich 41; 135 NW2d 370 (1965)]; *Minster* [*Machine Co v Diamond Stamping Co*, 72 Mich App 58; 248 NW2d 676 (1976)]; *Jordan v Solventol Chemical Products, Inc*, 74 Mich App 113; 253 NW2d 676 (1977).

The trial court acknowledged that "this *Darin* case definitely seems to be at odds with other Court of Appeals cases," but nevertheless relied on *Darin & Armstrong* in granting the motion. Subsequently, the judge denied Hurley's motion for rehearing, writing:

> The basis for the Court's decision granting cci summary judgment against Hurley and Hutchinson's third party complaint was that there was no

---

[15] Cci also sought summary judgment on Hurley's and Forsythe's claims for common-law indemnity. Neither of these is at issue here.

allegation of negligence against CCI in either the
Complaint or the Third Party Complaint and that,
even if there was, there could be no indemnifica-
tion where Hurley and Hutchinson were them-
selves negligent and CCI's position would be that of
a joint tortfeasor. The Court held that a showing
of joint negligence would not authorize indemnity
since it would be tantamount to an action for
contribution against the employer which is forbid-
den under Michigan law. *Darin & Armstrong v
Ben Agree Co,* 88 Mich App 128 [276 NW2d 869]
(1979); *Husted v Consumers Power Co,* 376 Mich
41 [135 NW2d 370] (1965).

At trial, Hurley moved to amend its pleadings to
add allegations of active negligence against CCI.
Hurley reasoned that if it could be proven that CCI
was concurrently negligent, CCI would be liable on
the indemnity agreement for Hurley's concurrent,
rather than sole, negligence. The trial judge de-
nied the motion to amend.

Hurley appealed these rulings to the Court of
Appeals, where the Court reasoned that the con-
tract expressed the parties' intent to indemnify
Hurley for its concurrent, but not sole, negligence.
Relying on its decisions in *Giguere v Detroit Edi-
son Co,* 114 Mich App 452; 319 NW2d 334 (1982),
*lv den* 414 Mich 961 (1982), and *Paquin v Har-
nischfeger Corp,* 113 Mich App 43; 317 NW2d 279
(1982), the Court of Appeals ruled that Hurley was
not precluded from asserting a claim for contrac-
tual indemnity due to the exclusive remedy provi-
sion of the Worker's Disability Compensation Act
(WDCA). MCL 418.131; MSA 17.237(131).

However, the Court of Appeals continued:

We find persuasive, however, CCI's argument
that in this case, the crane was not yet operational
and that plaintiff's injuries, resulting from assem-
bly of the crane, were not covered by the indemni-

fication contract. Under the contract, CCI assumed responsibility for the operation of the equipment, not for its assembly. Accordingly, the trial court did not err in dismissing Hurley's claim against CCI.

Hurley's challenge to this decision is two-fold: first, citing the well-known rule that appellate courts will not review issues or theories which are raised for the first time on appeal, Hurley claims that the Court of Appeals erred in considering CCI's claim that the indemnity agreement was not in effect at the time of Bosak's accident because the crane was not operational. In this regard, Hurley claims that while CCI's motion in the trial court involved only legal questions, the question whether or not the crane was "operational" is factual, and the facts necessary for this determination were not fully developed.

Second, Hurley argues that the limited evidence presented at trial shows that the crane *was* operational.

In response, CCI admits that the trial court did not discuss the issue, but asserts that the theory was pled, citing a paragraph from its affirmative defenses filed with its answer to the third-party complaint:

> 3. That, the alleged contract to which Third-Party Plaintiff refers to as a basis for contractual indemnity was not in effect at the time of the loss in question.

Also, CCI continues, appellate courts may interpret the language of indemnity agreements, and all of the facts necessary for the interpretation called for here are present. Hence, they urge affirmance of the Court of Appeals finding that the crane was not operational.

In the Court of Appeals, the issue was whether the contract of indemnification was unenforceable as a matter of public policy on the ground that Hurley could not receive indemnification from CCI because CCI, as plaintiff's employer, was protected from liability by the exclusive remedy provision of the WDCA.

The Court of Appeals answered this question in the negative, thus reversing the trial court's basis for granting summary judgment. However, the Court of Appeals went on to affirm the trial court's grant of summary judgment premised on CCI's argument that the crane was not operable at the time of the injury. With this determination, we do not agree.

In this Court, inasmuch as the Court of Appeals findings are not the subject of a cross-appeal by CCI, the sole issue for us to consider is the Court of Appeals decision regarding the operability of the crane.

In reviewing the Court of Appeals decision, we make our own independent examination of the pleadings filed and arguments made by the parties. Our examination of the record indicates that in the Court of Appeals CCI argued for the first time that the crane was not actually operating at the time of the accident,[16] although it had originally asserted that fact as an affirmative defense in its answer to the third-party complaint. Despite CCI's eleventh-hour resurrection of an affirmative defense, we decline Hurley's invitation to find that the issue was waived on appeal. However, we are not persuaded that the Court of Appeals could properly pass on the mixed question of law and fact, inasmuch as the trial court had not consid-

---

[16] No argument on this theory was made in CCI's motion for summary judgment, its brief in support thereof, or in its counsel's argument in support of the motion.

ered the question whether the crane was in operation at the time of the accident so that the indemnity agreement was enforceable. Moreover, it is evident from the parties' briefs that the facts necessary to the determination of the issue are disputed. Therefore, we remand the case to the trial court for consideration of the issue.

Affirmed in part, reversed in part, and remanded to the trial court for consideration of whether the crane was in operation at the time of the accident.

Costs to Forsythe; costs to CCI and Hurley to await final outcome; no costs to plaintiffs Bosak.

RYAN, BRICKLEY, CAVANAGH, and BOYLE, JJ., concurred with RILEY, J.

WILLIAMS, C.J. (*concurring*). While I concur in the result reached by the majority, I write separately to emphasize the narrowness of the holding with regard to plaintiffs claim that damages were unfairly diminished when the trial judge instructed the jury to reduce its award for future damages to present value, but refused to give a requested instruction on inflation.

The United States Supreme Court, in considering a damage award under the Longshoremen's and Harbor Workers' Compensation Act, 33 USC 904, has recently recognized the necessity of striking a balance between inflation and present value. *Jones & Laughlin Steel Corp v Pfeifer,* 462 US 523; 103 S Ct 2541; 76 L Ed 2d 768 (1983). A number of decisions in lower courts have reached similar conclusions. See, *e.g., Morvant v Construction Aggregates Corp,* 570 F2d 626 (CA 6, 1978), cert dis 439 US 801 (1978); *Doca v Marina Mercante Nicaraguense, SA,* 634 F2d 30 (CA 2, 1980), *cert den sub nom Pittston Stevedoring Corp v*

*Doca,* 451 US 971 (1981); *Cords v Anderson,* 80 Wis 2d 525; 259 NW2d 672 (1977); *Kaczkowski v Bolubasz,* 491 Pa 561; 421 A2d 1027 (1980).

In the present case, Justice RILEY notes that plaintiffs have not provided this Court with the requested instruction, but that the record indicates that the judge was asked to specify an inflation rate of thirteen percent. Further, since plaintiffs presented no testimony regarding inflation, the court was asked to instruct the jury as to this rate of future inflation as a matter of judicial notice. Although, in a properly presented case, I would find that inflation must be taken into account, on the record before us, I cannot say that the judge erred by refusing to take judicial notice of a future inflation rate of thirteen percent.

Therefore, I leave for another day consideration of this issue in a case in which a party makes an appropriate presentation of evidence and legal argument with regard to the necessity of an instruction on inflation to balance the standard jury instruction requiring reduction of future damages to present value.

BOYLE, J., concurred with WILLIAMS, C.J.

LEVIN, J. I concur with the decision of the Court on the several issues dealt with in the opinion of the Court with one exception. I would not predicate reversal of the Court of Appeals on the basis of the inherently dangerous activity issue, but rather on the ground that even if the trial judge erred on that issue the error was not prejudicial to the plaintiffs because they obtained a judgment against an apparently collectible defendant for the amount of the damages that this jury was willing to award.

One might suspect that if the jury had also

found Forsythe Development Company subject to liability, it might—there being two pockets rather than one—have been more generous. That would not, however, have justified a more generous award. It was the jury's obligation to assess the damages without regard to whether there was one, two, or more pockets and without regard to the theories of liability or the bases on which the defendant or defendants were found subject to liability. Absent any suggestion that the Hurley Corporation is uncollectible, any error in failing to submit to the jury the inherently dangerous activity theory against Forsythe does not justify ordering a new trial.

I

The opinion of the Court reviews the inherently dangerous activity doctrine and makes a number of observations regarding the application of that doctrine. Although this Court and the Court of Appeals have applied the doctrine, there is no decision of this Court where the doctrine has been considered and applied, in an opinion signed by a majority of the justices, to allow recovery by an injured worker, in a third-party action, following the receipt of workers' compensation from his employer.

As noted in the opinion of the Court, *McDonough v General Motors Corp,* 388 Mich 430; 201 NW2d 609 (1972), "produced four opinions, none of which had more than one co-signer." Under our decisions, *McDonough* is "not an authoritative interpretation binding on this Court under the doctrine of *stare decisis.*"[1]

In *Funk v General Motors Corp,* 392 Mich 91; 220 NW2d 641 (1974), this Court ordered a new

---

[1] See *Negri v Slotkin,* 397 Mich 105, 109; 244 NW2d 98 (1976).

trial because it concluded that the hazard there involved was not such as would justify the imposition of enterprise responsibility on the owner on the inherently dangerous activity theory.

The opinion of the Court quotes the black letter of §§ 416 and 427 of the Restatement of Torts, 2d. All the illustrations in the commentary accompanying the black letter, however, concern injuries caused to users of the public highway or sidewalk, or adjoining property resulting from damage to a party wall.[2]

It is one thing, on the basis of overriding social policy, to impose on the owner of land a nondelegable duty to protect persons who are injured while they are on the public highway, street, or sidewalk, or on their own land, from loss resulting from activity emanating from the owner's land, and quite another to impose on the owner a nondelegable duty to protect from loss persons injured on the owner's land.

In two of the cases cited in the opinion of the Court, *Inglis v Millersburg Driving Ass'n,* 169 Mich 311; 136 NW 443 (1912), and *Wight v H G Christman Co,* 244 Mich 208; 221 NW 314 (1928), the plaintiffs were adjoining property owners who suffered loss as a result of sparks or fire emanating from activities on defendant's land; those cases parallel the illustrations in the commentary following the black letter in the Restatement.

In *Watkins v Gabriel Steel Co,* 260 Mich 692, 695; 245 NW 801 (1932), the Court, declaring that "the record is not sufficiently complete to justify a holding that plaintiff is entitled to recover," permitted the injured worker to maintain an action against the general contractor for injuries result-

---

[2] See *Smith v Allendale Mutual Ins Co,* 410 Mich 685, 712-713; 303 NW2d 702 (1981); *Roberts v Auto-Owners Ins Co,* 422 Mich 594; 374 NW2d 905 (1985) (opinion of LEVIN, J.).

ing from the alleged negligence, in a work area where the plaintiff was working and was injured, of employees of a subcontractor other than the subcontractor who employed the injured plaintiff; this parallels *Funk,* where this Court recognized that a general contractor may have supervisory responsibilities in such work areas.[3]

In *Utley v Taylor & Gaskin, Inc,* 305 Mich 561; 9 NW2d 842 (1943), the Court held that the inherently dangerous activity doctrine did not apply in an action by a general contractor, as subrogee of an injured worker, against the subcontractor. The remaining decision of this Court cited in the opinion of the Court, is *Grinnell v Carbide & Carbon Chemicals Corp,* 282 Mich 509; 276 NW 535 (1937); the plaintiff's action was for product liability, an explosion of cooking equipment on board a cruiser, at a time when the law of products liability was in its infancy.

## II

I would defer further consideration and comment on the inherently dangerous activity doctrine until decision in the case makes it necessary for the Court to consider and apply the doctrine to resolve the dispute. As noted in n 6 of the opinion of the Court, the Court of Appeals is divided on the application of the doctrine where one defendant seeks indemnification from another. That difference of opinion implicates the question whether what constitutes an inherently dangerous activity is a question of law to be decided by the Court or a question ordinarily to be submitted for resolution by a jury. The opinion of the Court appears to suggest that it is appropriate to submit

[3] *Funk v General Motors Corp,* 392 Mich 104.

the question to a jury where "reasonable minds"[4] might conclude that the activity is inherently dangerous.[5] Recognizing that factual issues involved in the application of the inherently dangerous activity doctrine must be decided by the trier of fact, I question whether the policy questions should be left at large to be resolved by the trier of fact and submerged in its verdict.

There are a host of problems which the Court should most assuredly address,[6] but this is not the case to begin to do so.

---

[4] *Ante,* p 728.

[5] The Court of Appeals has held that the question whether an activity is inherently dangerous is an issue of fact to be submitted to the jury. *Dowell v General Telephone Co,* 85 Mich App 84, 91; 270 NW2d 711 (1978), *lv den* 405 Mich 803 (1979); *Brown v Unit Products Corp,* 105 Mich App 141, 149-150; 306 NW2d 425 (1981), *remanded* 414 Mich 956 (1982).

Contrast the Kansas Supreme Court and Tennessee Court of Appeals holdings that the question whether ditch digging is inherently dangerous is for the court, *Balagna v Shawnee County,* 233 Kan 1068; 668 P2d 157 (1983); *Kemp v Knox County,* 556 SW2d 546 (Tenn App, 1977), with the Missouri Supreme Court's holding that the question was for the jury. *Smith v Inter-County Telephone Co,* 559 SW2d 518 (Mo, 1977).

[6] See *Warren v McLouth Steel Corp,* 417 Mich 941 (1982) (RYAN, J., *dissenting*).