**AMOCO PIPELINE COMPANY, Plaintiff,**

v.

**HERMAN DRAINAGE SYSTEMS, INC., James Herman, Eric Herman, and Larry Timm and Carlen Timm, both individually and jointly and severally, Defendants.**

**Case No. 1:00–CV–729.**

United States District Court, W.D. Michigan, Southern Division.

Feb. 6, 2002.

Gene S. Davis, Detroit, MI, for Plaintiff.

Michael B. Ortega, Kalamazoo, MI, James R. Durant, Portage, MI, James W. Smith, Kalamazoo, MI, for Defendants.

## OPINION

QUIST, District Judge.

Plaintiff, Amoco Pipeline Company ("Amoco"), has sued Defendants, Herman Drainage Systems, Inc. ("HDS"), James Herman, Eric Herman (referred to along with James Herman as the "Hermans"), and Larry and Carlen Timm (the "Timms"), in this diversity action alleging claims for violation of the Michigan "MISS–DIG" act for the protection of underground facilities, M.C.L. §§ 460.701–.718, negligence, trespass on Amoco's pipeline easement, and performance of an inherently dangerous activity without taking special precautions to avoid harm. The incident upon which Amoco's claims are based occurred on March 16, 1999, when the Hermans struck Amoco's pipeline and caused it to rupture while laying drainage tile for the Timms in the Timms' field. Now before the Court are: (1) Amoco's motion for partial summary judgment; (2) the Timms' motion for summary judgment; and (3) Amoco's motion to amend its complaint to add a claim under the Michigan Natural Resources Environmental Protection Act.

### Facts

The State of Michigan has enacted a law designed to prevent damage to underground facilities during excavation or other similar activity (the "MISS–DIG act" or

"Act") by requiring certain persons to notify the MISS–DIG association prior to conducting such activities. After receiving notice, the association notifies its members to enable them to mark the location of their underground facilities in the area in which the activity is to occur. Section 5(1) of the MISS–DIG act provides, in relevant part, that

> a person ... responsible for excavating ... in a street, highway, other public place, a private easement for a public utility, or near the location of utility facilities on a customer's property ... shall give written or telephone notice to the [MISS–DIG] association ... at least 2 full working days ... but not more than 21 calendar days, before commencing the excavating....

M.C.L. § 460.705(1).

Amoco is engaged in the business of providing and maintaining pipelines for the transport of gasoline and other petroleum substances. Amoco owns and maintains a pipeline which runs between Whiting, Indiana and River Rouge, Michigan. The pipeline runs through Branch County, Michigan, and in particular, in a southwesterly to northeasterly direction through a 254 acre field owned by the Timms located in the north half of section 35, Sherwood Township (the "field"). Amoco located and maintained the pipeline in the field pursuant to an easement granted in 1948 by the Timms' predecessor-in-interest to Amoco's predecessor-in-interest, Standard Oil Company.

Throughout this litigation, the parties have referred to the field as consisting of an east field and a west field. As depicted on the photographs and other exhibits submitted by the parties in support of and in opposition to the motions, the east field and the west field are roughly divided by a county drain which runs across the field in a north and south direction. (Pl.'s Resp. Defs. Timm Mot. Ex. A; Defs. Timm Exs.

Supp. Mot. Ex. B.) The drain is open in the north part of the field. An untillable marsh area is located immediately to the west of the open drain and a wooded area is located adjacent to the southeast corner of the marsh. A pile of stones is located immediately west of the wooded area. The pipeline runs through the west field immediately south of the stone pile and continues through the marsh and into the east field.

Eric Herman and his father, James Herman, are full-time farmers and have lived on and farmed land in the area near the field for many years. (James Herman 6/20/01 Dep. at 3–5, Defs. Timm Exs. Supp. Mot. Ex. M; Eric Herman 6/20/01 Dep. at 3–4, Defs. Timm Ex. Supp. Mot. Ex. K.) Based upon their experience in the area, both men were familiar with the pipeline; in fact, it runs across their respective farms. (James Herman 6/20/01 Dep. at 10.) Eric Herman organized HDS in 1996 for the purpose of conducting a drain tile installation business. HDS's equipment consists of a bulldozer with a tile plow attached and a stringer cart that holds the drain tile as it is being installed. A laser mounted on the bulldozer helps to ensure that the tile is installed on a proper grade. Eric Herman is the only employee of HDS, although James Herman sometimes provides labor to HDS as an independent contractor. (James Herman Aff. ¶¶ 6–8, Def. J. Herman's Br. Opp'n Ex. 9.) Because Eric Herman installed drain tile on a part-time basis, by 1998 he had done only eight or nine jobs. (Eric Herman 6/20/01 Dep. at 37–38.)

The Timms, who are also engaged in farming, purchased the field in 1988 and, because they were familiar with the area, were aware that the pipeline ran through the field even prior to that time. In late 1997 or early 1998, Larry Timm and a neighbor installed drain tile in the east

field near the pipeline in order to make more of the land tillable. At that time, Timm called MISS–DIG and had the area flagged, or marked in order to avoid hitting the pipeline. (Larry Timm Dep. at 39–40, Pl.'s Br. Supp. Ex. 3.)

In 1998, Timm spoke with Eric Herman about installing additional drain tile in the east field. Timm decided to have HDS perform the work because Timm's previous work did not improve the drainage and HDS had equipment Timm did not have that would allow the drain tile to be placed at the proper grade. After some discussions, the parties reached an oral agreement that HDS would do the work and charge 28¢ per foot for the installation. There was no written contract. Initially, Timm told Eric Herman that he wanted four-inch lines run easterly to the six-inch line Timm and his neighbor had previously installed. (Larry Timm. Aff. ¶ 9, attached to Defs.' Timm Mot. Summ. J.) However, after surveying the field, Eric Herman advised Timm that because the field was so flat, several four-inch tiles should run in a southwesterly direction parallel with the pipeline into the drainage ditch.[1] (*Id.;* Eric Herman 6/20/01 Dep. at 49–50.) Eric Herman and Timm agreed that the lines should be spaced fifty feet apart, after Timm rejected Eric Herman's suggestion that the tiles be laid closer together. (Eric Herman 12/19/00 Dep. at 49, Pl.'s Br. Supp. Ex. 5.)

Although Eric Herman, James Herman, and Timm were aware of the pipeline, they did not discuss who would be responsible for calling MISS–DIG. However, Eric Herman made the call and notification was given to Amoco. On June 26, 1998, after receiving the information, Amoco's head pipeliner, Harland Brown ("Brown"), visited the site to flag the pipeline according to the information he received from MISS–DIG. Brown flagged the pipeline in the east field from Van Warmer Road up to the drainage ditch. (Brown Dep. at 21, Defs.' HDS and Eric Herman Br. Supp. Mot. Ex. 4.) After speaking with Eric Herman, Brown returned to the field a few weeks later and marked from the other side of the drainage ditch through the marsh up to the edge of the west field. (*Id.* at 22, 38–39.)

Eric Herman and James Herman completed most of the work in the east field in March 1999 without incident. At the conclusion of that work, Timm asked Eric Herman to install three drain tiles in the west field beginning at the ditch, going around the woods, and stopping short of the stone pile. Although the proposed installation would cross the pipeline, no one called MISS–DIG and the pipeline was not flagged. On March 15, while laying tile in the west field, Eric Herman hit what he believed to be a rock near the stone pile. The following day, while the Hermans were working in the same area, the tile plow struck the pipeline and broke it. The Hermans notified Brown, who advised them he would come to the site immediately. The Hermans then notified the Timms of the accident. Approximately 3,300 gallons of gasoline were released from the pipeline. Amoco was required to hire outside contractors to remove the gasoline, repair the pipeline, and remove the contamination from the soil. On September 28, 2000, Amoco filed this action against the Hermans and HDS seeking to recover its costs for clean up and repair as a result of the accident. Amoco filed its amended complaint on February 5, 2001, adding the Timms as defendants.

---

**1.** The decision to run the drain tiles parallel with the pipeline was made sometime after

Amoco marked the pipeline.

### Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### Discussion

### I. Motions for Summary Judgment

Amoco contends that it is entitled to summary judgment on all of its claims against all of the defendants because there is no genuine issue of material fact that under the MISS–DIG statute and the common law, all of the defendants had the duty to contact MISS–DIG and to refrain from interfering with Amoco's easement but failed to do so, thus causing Amoco's damages. The Timms also seek summary judgment upon several grounds. First, the Timms contend that the Hermans and HDS were responsible for the excavation and, therefore, under the MISS–DIG statute, they were solely responsible for contacting MISS–DIG to ensure that the pipeline was properly marked. Second, the Timms contend that they have no liability

because HDS was an independent contractor and none of the exceptions to the independent contractor rule apply. Finally, the Timms contend that Carlen Timm cannot be held liable because except for signing the checks for the work done by HDS, she played no part at all in the accident. James Herman contends that Amoco's motion must be denied because at the time of the accident, he was essentially a bystander not responsible for the tiling operations. In addition, James Herman, along with Eric Herman and HDS, contends that summary judgment must be denied because there is evidence tending to show that Amoco itself was negligent in failing to flag the pipeline as requested.

### A. The MISS–DIG Act

Count I of Amoco's First Amended Complaint alleges that Defendants violated the MISS–DIG act by failing to ascertain the location of the pipeline before excavating and by failing to serve written or telephonic notice of their intent to excavate in the west field to allow Amoco sufficient time to mark the pipeline in order to minimize the risk of injury to the pipeline. Section 3 of the act states: "A person ... shall not ... excavate ... in ... a private easement of a public utility ... without having first ascertained ... the location of all underground facilities of a public utility in the proposed area of excavation...." M.C.L. § 460.703.[2] Pursuant to section 5, "a person ... responsible for excavating ... in ... a private easement for a public utility" is required to "give written or telephone notice to the [MISS–DIG] association ... at least 3 full working days, excluding Saturdays, Sundays, and holidays, but not more than 21 calendar days, before commencing the excavation." M.C.L.

---

**2.** A "public utility" includes a "pipeline company subject to the jurisdiction of the public service commission." M.C.L. § 460.701(d).

Defendants do not argue that Amoco is not a "public utility" as defined by the act.

§ 460.705(1). Once a member utility such as Amoco has received notice from the MISS–DIG association, the utility must inform the notifying person at least one day prior to commencement of the excavation or other activity of the location of the utility's underground facilities by marking with colored stakes or flags. M.C.L. § 460.708. Upon receipt of such information from a public utility, "a person ... excavating ... [must] exercise reasonable care when working in close proximity to the underground facilities of [the] public utility," including use of "hand-digging" if the facilities are or are likely to be exposed. M.C.L. § 460.711. Any person responsible for giving notice but who fails to do so is liable for any "resulting damage to the underground facilities," subject to a reduction for the proportion of the public utility's negligence, if any, for failing to properly mark its facilities. M.C.L. § 460.714. Amoco contends that all Defendants are liable under the Act based upon their failure to give notice to MISS–DIG of their intent to excavate in the west field.

## 1. Person Responsible for Excavating

The Timms contend that they cannot be held liable under the Act because they were not "a person ... responsible for excavating" and thus were not responsible for giving notice to MISS–DIG. Although the Act contains a definitions section, it does not define the term "responsible," although it does define "person" as including "an individual, partnership, corporation, or association." M.C.L. § 460.701(b). The Timms contend that under the Act, the person performing the actual work is the person responsible for giving notice to MISS–DIG. In support of their argument, the Timms cite the following language in section 5(1): "a person ... responsible for excavating ... on a customer's property ... shall give written or telephone notice to" MISS–DIG.

M.C.L. § 460.705(1). The Timms also point out that under section 11, once the utility marks the location of its facilities, "a person.. excavating ... [must] use reasonable care when working in close proximity to the underground facilities." M.C.L. § 460.711. In addition, the Timms note that liability is imposed upon "the person responsible for giving the notice of intent to excavate." M.C.L. § 460.714.

Amoco contends that the provisions of the Act are broad enough to impose responsibility for notifying MISS–DIG upon property owners, such as the Timms, who hire or arrange for someone to excavate on their property. In particular, Amoco relies on the following language in section 5(2): "The written or telephone notice of intent shall contain the name, address, and telephone number of the person or public agency filing the notice of intent, [and] the name of the person or public agency performing the excavation...." M.C.L. § 460.705(2). Amoco argues that this language supports its position because it contemplates that the person giving the notice may be someone other than the person doing the excavating, such as the property owner.

When called upon to interpret a statute, a court must ascertain and give effect to the intent of the legislature. *Frankenmuth Mut. Ins. Co. v. Marlette Homes, Inc.*, 456 Mich. 511, 515, 573 N.W.2d 611, 613 (1998). The court must look to the specific language of the statute and may apply judicial rules of construction only if the language of the statute is not clear. *Mich. State Bldg. & Constr. Trades Council v. Perry*, 241 Mich.App. 406, 411, 616 N.W.2d 697, 700 (2000). All words and phrases of the statute must be given effect; a construction which negates any part of the statute or renders it surplusage should be avoided. *People v. Borchard–Ruhland*, 460 Mich. 278, 285,

597 N.W.2d 1, 6 (1999). "Unless explicitly defined in a statute, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used." *Mich. State Bldg. & Constr. Trades Council,* 241 Mich.App. at 411, 616 N.W.2d at 700. Where the meaning of the language in the statute is doubtful, the court must examine the purpose of the statute and construe it in a manner that will fulfill the legislature's purpose. *Marquis v. Hartford Accident & Indem.,* 444 Mich. 638, 644, 513 N.W.2d 799, 802 (1994).

■ The Court begins its analysis first with section 11 of the Act, which imposes liability for failure to notify MISS–DIG upon "the person responsible for giving the notice of intent." Section 5(1) specifies the person responsible for giving the notice: "a person ... responsible for excavating." Whom is "responsible" for excavating is not entirely clear from the statute. The dictionary definition of responsible includes "answerable or accountable, as for something within one's power, control, or management," or "chargeable with being the author, cause, or occasion of something." *The Random House Dictionary of the English Language* 1641 (2d ed.1987). There is no question that the person who actually performs the work is "responsible for excavating." Responsibility can also be considered in a broader sense. For example, assume an owner hires a general contractor to build a building, the general contractor hires a subcontractor to do the cement work, and the cement contractor hires a subcontractor to dig out the foundation. All of those persons could be considered responsible for the excavation because each one played some role in causing it to occur. However, only one of those persons—the person actually digging the foundation—is responsible for performing the excavation.

This Court concludes that the phrase "a person ... responsible for excavating" is limited to the person or persons actually responsible for performing the work. An owner who hires a contractor to perform excavation work is responsible only in the sense that he or she has decided to have the work done. The responsibility for ensuring that the excavation work is done correctly and according to workmanlike standards, such that it does not interfere with underground facilities, is on the contractor. Such a construction makes sense because generally, the contractor is in the best (although perhaps not the only) position to provide the necessary information to MISS–DIG, and the contractor, who is on-site, can verify whether the marked underground facilities are in the area where the work is to be performed. Requiring the person actually performing the excavation to notify MISS–DIG thus provides certainty because there can be no question among several possible parties about who should give the notice.

Amoco's argument regarding section 5(2), i.e., that the statute contemplates notice by a person other than the contractor, does not support Amoco's interpretation. The fact that one person may provide notice and another person may perform the excavating does not persuade this Court that someone other than the person (be it an individual, a corporation, etc.) responsible for performing the excavation is responsible for giving the notice. Section 5(1) addresses who must provide the notice and section 5(2) addresses the content of the notice. For example, if ABC Corporation (a person under the Act) is hired to perform excavation services, one of its employees may give notice to MISS–DIG and another employee may be in charge of performing the work. ABC Corporation, as the person responsible for the excavation, is still responsible for providing the notice. Or, a person other than the con-

tractor may agree to give the notice, even though not specifically required to do so by law.

Amoco contends that it would be contrary to the purposes of the Act to hold that an owner, such as the Timms, with knowledge of an underground pipeline on the property could hire someone to excavate on the property yet have no responsibility for notifying MISS–DIG that the contractor was digging in the area of the pipeline. The Court disagrees, because nothing in the Act suggests that a person is responsible for providing notice to MISS–DIG depending upon his knowledge of underground facilities on the property; rather, the inquiry is whether he is responsible for the excavation.

In this case, Larry Timm hired HDS and Eric Herman to install the drain tile, including the excavation work necessary to complete the installation. Larry Timm instructed Eric Herman where to install the drain tiles but otherwise was not responsible for any aspect of the job. Therefore, the Timms were not persons responsible for the excavation and cannot be held liable. On the other hand, there is no dispute that Eric Herman and HDS were responsible for the excavation and are liable for damage resulting to the pipeline due to their failure to provide notice of intent to excavate to MISS–DIG. In fact, Eric Herman provided the notice to MISS–DIG prior to performing the work in the east field but failed to do so with regard to his work in the west field.

Although James Herman did not raise the issue in his brief, the Court concludes that, like the Timms, James Herman was not responsible for providing notice to MISS–DIG because he was not responsible for the excavation. While it is true that James Herman assisted Eric Herman in installing the drain tile, Larry Timm hired HDS to do the work. (Larry Timm Dep. at 43.) It is undisputed that James Her-

man was not an employee of HDS and did not operate the bulldozer. Because James Herman was only providing assistance to HDS and did not perform the excavation, he was not responsible for the excavation and thus cannot be held liable for failure to give notice.

## 2. Amoco's Failure to Mark

■ Although James Herman, Eric Herman, and HDS do not raise any specific arguments in their briefs regarding the Act, they argue that summary judgment must be denied because there is a genuine issue of material fact with regard to whether Eric Herman gave the required notice. The Hermans and HDS contend that the notice given by Eric Herman was for a significantly larger area than that initially and subsequently flagged by Brown and that the west field was not flagged as a result of Amoco's negligence in either failing to follow, or obtain clarification of, the directions received from MISS–DIG. The Court rejects this argument because it is contrary to both the undisputed facts and the law. The only evidence before the Court regarding notice given by Eric Herman was the notice he gave to MISS–DIG in June 1998. At that time, Larry Timm had only requested Eric Herman and HDS to install drainage tiles in the east field. While it is true that Brown made another trip to the Field to perform additional flagging west of the drainage ditch in July 1998 after speaking with Eric Herman, it is undisputed that Larry Timm did not even mention the work in the west field to Eric Herman until March 1999, more than six months after Brown made his last visit to the Field. (Eric Herman 6/20/01 Dep. at 23–24.) Thus, there was no reason for Brown or anyone else to believe in 1998 that it would be necessary to mark the pipeline into the west field-well beyond the area where the proposed work was to be per-

formed. Furthermore, even if Eric Herman had requested that the west field be flagged in 1998, the request would not have complied with the statute because it would have been made more than 21 days prior to the time the work commenced. *See* M.C.L. § 460.705(1). Thus, pursuant to M.C.L. § 460.714, Eric Herman and HDS are liable for "the resulting damage to the" pipeline.

### B. Trespass

▪ Amoco alleges in Count III of its first amended complaint that Defendants committed a trespass by intruding in Amoco's easement and interfering with Amoco's use of the pipeline. A trespass is an unauthorized entry upon the land of another. *Am. Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 239 Mich.App. 695, 705, 609 N.W.2d 607, 613; *Cloverleaf Car Co. v. Wykstra Oil Co.*, 213 Mich.App. 186, 195, 540 N.W.2d 297, 302 (1995). Although the defendant's intent is generally irrelevant to a claim of trespass, *Traver Lakes Cmty. Maint. Ass'n v. Douglas Co.*, 224 Mich. App. 335, 345, 568 N.W.2d 847, 852 (1997), the defendant must intend to enter the plaintiff's property without authorization to do so. *Cloverleaf Car Co.*, 213 Mich. App. at 195, 540 N.W.2d at 302.

▪ Michigan courts have held that a trespass occurs where a person interferes with another's right to use an easement. *See Marathon Pipe Line Co. v. Nienhuis*, 31 Mich.App. 407, 188 N.W.2d 120 (1971). The most recent case from Michigan courts addressing a claim of trespass in the context of an underground structure is the Michigan Court of Appeals' unreported decision in *S.D. Warren Co. v. Hydaker–Wheatlake Co.*, Nos. 216208, 216271, 2001 WL 753896 (Mich.Ct.App. Feb. 6, 2001)(per curiam). The specific issue presented, as framed by the court, was "how the 'intent to intrude' element required for liability in trespass should be applied in a case involving damage to a privately-owned, underground sewer line located within a valid easement." *Id.* at *4. In that case, the City of Muskegon retained Consumers Power Company to install a power line through property the city leased from the State of Michigan. After conferring with the city regarding the route and method of installation of the power line, Consumers Power contacted MISS–DIG. MISS–DIG disclosed the existence of an oil pipeline in the area of the installation but did not disclose the plaintiff's sewer line because it was not registered with MISS–DIG. Subsequently, while installing the power line, the contractor hired by Consumers Power struck and damaged the plaintiff's sewer line. The plaintiff sued Consumers Power and its contractor alleging claims for trespass and negligence. The plaintiff moved for summary judgment, arguing that the defendants were liable for trespass as a matter of law because it was undisputed that the defendants intruded upon the plaintiff's sewer line without the plaintiff's permission. The defendants argued that the claim should be dismissed because the plaintiff could not show that the defendants had actual or constructive notice of the sewer line. The trial court agreed with the plaintiff and granted the plaintiff's motion. The court of appeals reversed, concluding that the plaintiff was required to show that the defendants had actual or constructive knowledge of the sewer line. *Id.* at *8. In its analysis, the court examined two prior cases dealing with underground structures, *Edison Illuminating Co. v. Misch*, 200 Mich. 114, 166 N.W. 944 (1918), and *Marathon Pipe Line Co. v. Nienhuis*, 31 Mich.App. 407, 188 N.W.2d 120 (1971), and noted that while their holdings "are less than clear, both cases contain language suggesting that notice or knowledge is a factor to consider in determining a contractor's liability in tres-

pass for damaging an underground structure." *S.D. Warren Co.*, 2001 WL 753896, at *6. The court also noted that the requirement of actual or constructive notice of the underground structure it was adopting represented the view of a majority of jurisdictions. *Id.* at *8.

Although *S.D. Warren Co.* is an unreported decision, this Court finds the decision persuasive and believes that it correctly defines Michigan law on the issue before the Court. Thus, in order to prevail on its trespass claim, Amoco must show that: (1) the defendants interfered with Amoco's use and enjoyment of the easement; and (2) the defendants had "actual or constructive notice of the location and existence of the" pipeline. *Id.* at *4, 8.

### 1. Eric Herman and HDS

■■ Amoco has presented evidence establishing all of the necessary elements for a claim of trespass against Eric Herman and HDS. Eric Herman, acting on behalf of HDS, committed the trespass when he struck the pipeline, which was located within Amoco's easement, with the tile plow. *See id.* at *4. At that time, Eric Herman had actual and constructive knowledge of the existence and location of the pipeline in the west field where he was working, based both upon his many years as a resident and a landowner in the community and his experience in performing the work in the east field. In fact, Eric Herman had actual knowledge of the pipeline because he contacted MISS–DIG before doing his work in the east field to make sure that the pipeline was marked.

Eric Herman and HDS do not dispute that Eric Herman knew that the pipeline ran through the west field. They argue, however, that there remains a question for the jury as to whether Amoco is solely at fault because it failed to properly mark the pipeline into the west field where the accident occurred. As discussed above, this argument must be rejected because the undisputed evidence shows that Brown, Amoco's representative, marked the portion of the pipeline within the area of the work performed in the east field in 1998. The work performed in the west field was not even discussed until March 1999; therefore, Brown had no reason to mark that portion of the field in 1998.

### 2. James Herman

James Herman contends that he cannot be held liable for trespass because he was not operating the bulldozer and had no control over it when it struck the pipeline, he had no authority to direct the business of HDS, and he was not an employee of HDS. James Herman asserts that he cannot be held liable because at the time of the accident, he was just walking along the side of the bulldozer without interfering with Amoco's easement.

■■ Under Michigan law, a person need not actively participate in a trespass in order to be held liable. "Generally, all who wrongfully contribute to the commission of a trespass are equally liable with the person committing the act complained of." *Helsel v. Morcom*, 219 Mich.App. 14, 22, 555 N.W.2d 852, 855 (1996)(per curiam)(citing *Kratze v. Indep. Order of Oddfellows*, 190 Mich.App. 38, 43, 475 N.W.2d 405, 408 (1991)(per curiam), *aff'd in part and rev'd in part on other grounds*, 442 Mich. 136, 500 N.W.2d 115 (1993)). Liability arises where the person not actively engaged in the trespass contributes to the trespass through encouragement, advice, or suggestion. *Id.* Applying this rule, there is sufficient evidence to hold James Herman liable for trespass based upon the role he played in the installation of the drainage tile, which ultimately lead to the trespass. James Herman's suggestion that he was "just walking beside the bulldozer" is not an accurate characterization

of the evidence. James Herman testified in his deposition that at the time of the accident he was helping to install the drainage tile by stringing it out from the stringer cart. (James Herman 12/19/00 Dep. at 22–23.) When the bulldozer hit the pipeline, James Herman signaled to Eric Herman that they hit the pipeline and "motioned for him to back up, raise the plow up, and take off." (*Id.* at 25–26.) Thus, James Herman was more than just a detached observer; he was actively involved in the activity that lead to the trespass.

### 3. Larry Timm[3]

Amoco contends that Larry Timm is liable for the trespass by Eric Herman and HDS because Timm hired Eric Herman and HDS to perform the work in the west field with full knowledge that the work would be performed in the area of the pipeline. Larry Timm argues that he cannot be held liable for trespass because the MISS–DIG Act imposes a statutory duty upon the person responsible for the excavation—Eric Herman and HDS—for ascertaining the location of underground facilities by giving notice and holds such person liable for damage resulting from the failure to give notice. While not saying so directly, Larry Timm argues in so many words that the MISS–DIG statute has abolished common law negligence or trespass, at least with regard to underground facilities.

■ The Court rejects the argument, to the extent it is raised by Larry Timm, that the MISS–DIG Act has abolished common law negligence and trespass. "Well-settled common-law principles are not to be abolished by implication, and when an ambiguous statute contravenes common law, it must be interpreted so that it makes the least change in the common law." *Burden v. Elias Bros. Big Boy*

*Rests.,* 240 Mich.App. 723, 727, 613 N.W.2d 378, 381 (2000)(per curiam). The purpose of the Act is to prevent damage to underground facilities by creating an organization designed to receive notice of proposed excavation or other work and to convey notice to member utility companies to enable them to clearly mark the location of their facilities. To achieve its purpose, the Act places responsibility for providing such notice upon those responsible for performing the work and imposes liability if damage occurs due to failure to provide notice. The Court finds nothing in the Act suggesting that the legislature intended to abolish or restrict the availability of the common law torts of negligence or trespass where underground structures owned by MISS–DIG member utilities are involved. Moreover, there is nothing in the MISS–DIG Act which is inconsistent or contrary to the common law.

■ The evidence in the record supports liability against Larry Timm for at least two reasons. First, as noted above in the discussion regarding James Herman, a third-party who does not actively participate in a trespass may be held liable for providing some form of assistance or encouragement to the person committing the trespass. *Kratze,* 190 Mich.App. at 43, 475 N.W.2d at 408. Here, Larry Timm not only made it possible for Eric Herman and HDS to commit the trespass by allowing them on the property, but directed them to the area of the pipeline with knowledge of its existence. Larry Timm is also liable because he employed HDS and Eric Herman:

One who employs an independent contractor to do the work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another or the creation of a Public or a private nuisance, is subject

3. The Court will discuss Carlen Timm's liability separately.

to liability for harm resulting to others from such trespass or nuisance.

*Bleeda v. Hickman–Williams & Co.*, 44 Mich.App. 29, 34, 205 N.W.2d 85, 88–89 (1972)(quoting Restatement (Second) of Torts § 427B (1965)). *See generally,* 17 Am.Jur.2d *Trespass* § 73 (1991)("One who employs an independent contractor to do work, which the employer knows or has reason to know is likely to involve a trespass upon the land of another, is subject to liability for the harm resulting to others from such trespass."). In *Bleeda,* the plaintiffs sued Korno's, a company engaged in coke screening, and Hickman–Williams, Korno's only customer, alleging that dust and odors emanating from Korno's plant constituted a nuisance. Hickman–Williams argued that Korno's was an independent contractor and, therefore, Hickman–Williams was not liable for the nuisance as a matter of law. In rejecting the argument, the court adopted the rational espoused by various scholars for holding a defendant liable for the acts of its independent contractor, namely: a defendant should accept responsibility for the risks it creates in its enterprise as a cost of doing business. *Bleeda,* 44 Mich. App. at 35–36, 205 N.W.2d at 89. The court concluded that Hickman–Williams could be held liable for the nuisance because it was aware of Korno's method of screening and how the coke would be sized and because it was aware of the extent of damage to the plaintiffs caused by Korno's screening method. *Id.* at 37, 205 N.W.2d 85. Although *Bleeda* involved a nuisance claim, its rationale is applicable here because Larry Timm was aware of the work HDS and Eric Herman were to perform, was familiar with the method for accomplishing the work, and knew of the special risk presented by the pipeline. Therefore, Larry Timm is liable for the trespass by Eric Herman and HDS.

### C. Negligence

■■■■ Amoco's final claim is that Defendants are liable for negligence. In order to establish a claim of negligence, a plaintiff must present evidence showing that: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached the duty; (3) the breach was the proximate cause of the plaintiff's injuries; and (4) the plaintiff suffered damages. *Spikes v. Banks,* 231 Mich.App. 341, 355, 586 N.W.2d 106, 112–13 (1998). Whether a defendant owed a duty to the plaintiff is an issue of law for the court to decide. *Tame v. A.L. Damman Co.,* 177 Mich.App. 453, 455, 442 N.W.2d 679, 680 (1989).

> In determining whether a duty exists, courts look to different variables, including: foreseeability of the harm, existence of a relationship between the parties involved, degree of certainty of injury, closeness of connection between the conduct and the injury, moral blame attached to the conduct, policy of preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach.

*Krass v. Joliet, Inc.,* 233 Mich.App. 661, 668–69, 593 N.W.2d 578, 582 (1999)(citing *Buczkowski v. McKay,* 441 Mich. 96, 100–01 & n. 4, 490 N.W.2d 330, 333 & n. 4 (1992)).

### 1. Eric Herman and HDS

■■■ Eric Herman and HDS breached their duties to Amoco in two respects. First, under the Act, Eric Herman and HDS had a duty to notify MISS–DIG of their intent to excavate in order to allow Amoco the opportunity to mark its pipeline. The purpose for requiring notice of such activity is the prevention of damage to underground facilities, such as the pipeline at issue in this case. Eric Herman and HDS failed to provide the required notice, thus depriving Amoco of the oppor-

tunity to mark the pipeline. All witnesses agreed that the accident would not have occurred if the pipeline had been flagged in the west field. The Court also concludes that Eric Herman and HDS owed a duty to Amoco to use reasonable care not to strike or damage the pipeline while installing drainage tile in the west field based upon Eric Herman's prior knowledge of the location and existence of the pipeline and his previous dealings with Amoco. Eric Herman knew that the pipeline ran through the field, that laying drainage tile in the Field would present the risk of bodily or property injury due to the presence of the pipeline, that the lack of markers increased the risk of striking the pipeline, and that the risk could have been eliminated through simple precautions, such as a telephone call to MISS–DIG. Eric Herman's and HDS's failure to use reasonable care was the direct and proximate cause of Amoco's injuries.

### 2. James Herman

■ James Herman contends that he cannot be held liable for negligence because he was not an owner, employee, or agent of HDS and therefore cannot be liable for the corporation's acts. The Court disagrees. The considerations discussed above with regard to Eric Herman also apply to James Herman. That is, from his prior experience performing the work in the east field, James Herman knew that the pipeline extended into and ran across the west field. James Herman also knew that it was foreseeable that laying drainage tile in the west field without the pipeline being marked involved a substantial risk and high probability of injury that could have been easily avoided. James Herman was not a casual bystander merely observing what Eric Herman was doing; he was actively involved in the activity that lead to the injury. For these reasons, James Herman, like Eric Herman, had a duty to use reasonable care to not strike or damage the pipeline while laying drainage tile. Amoco's injuries were caused by James Herman's breach of that duty.

### 3. Larry Timm

■ Amoco contends that there are two bases for holding Larry Timm liable for negligence. First, Amoco contends that Larry Timm is directly liable because he breached his duty to notify MISS–DIG of the excavation and he breached his duty as the owner of the subservient estate not to interfere with Amoco's use and enjoyment of the easement. Second, Amoco contends that Larry Timm is vicariously liable for the negligence of Eric Hermans.

With regard to the issue of Larry Timm's own negligence, the Court has already concluded that Larry Timm was not responsible for the excavation and, therefore, was not responsible for giving notice to MISS–DIG. However, the Court agrees with Amoco that Larry Timm, as the owner of the subservient estate, did owe a duty to Amoco not to interfere with its use and enjoyment of the easement. Because there are disputed issues of material fact, the issue of whether Larry Timm breached that duty cannot be decided on summary judgment. Larry Timm testified that he mentioned the pipeline to Eric Herman in March of 1999 before the work in the west field commenced. (Larry Timm Dep. at 65–67.) Eric Herman gave contradictory testimony, stating that Timm never mentioned the pipeline to them in connection with the work in the west field. (Eric Herman 12/19/00 Dep. at 64.) Given the conflicting testimony, the Court concludes that a material issue of genuine fact remains with regard to whether or not Larry Timm breached his duty of care to Amoco. If Larry Timm's testimony is believed, the jury may conclude that he was not negligent because he brought the pipe-

line to the attention of Eric Herman, who was responsible for giving notice to MISS–DIG. On the other hand, if the jury chooses to accept Eric Herman's testimony, it may conclude that Larry Timm was negligent because he failed to instruct Eric Herman to have the pipeline marked.

 Amoco also contends that Larry Timm is vicariously liable for the negligence of Eric Herman and HDS. Larry Timm contends that he cannot be held liable for the acts of HDS and Eric Herman because HDS was an independent contractor. In general, an owner who retains an independent contractor may not be held liable in negligence to third parties for the acts of the contractor. *Candelaria v. B.C. Gen. Contractors, Inc.,* 236 Mich. App. 67, 72, 600 N.W.2d 348, 352 (1999). However, one of the well-recognized exceptions to this rule, which Amoco pleads as its fourth claim, is the inherently dangerous activity doctrine, which provides that "[a]n employer is liable for harm resulting from work 'necessarily involving danger to others, unless great care is used' to prevent injury, or where the work involves a 'peculiar risk' or 'special danger' which calls for 'special' or 'reasonable' precautions." *Butler v. Ramco–Gershenson, Inc.,* 214 Mich.App. 521, 525, 542 N.W.2d 912, 915 (1995)(quoting *Bosak v. Hutchinson,* 422 Mich. 712, 727–28, 375 N.W.2d 333, 340 (1985)) (citations omitted). In order for this doctrine to apply, the special risk of danger must have been apparent to the owner at the time the work was contracted. *Phillips v. Mazda Motor Mfg. (USA) Corp.,* 204 Mich.App. 401, 406, 516 N.W.2d 502, 506 (1994). Liability is "closely akin to, but not exactly the same as, strict liability." *Vannoy v. City of Warren,* 15 Mich.App. 158, 163, 166 N.W.2d 486, 489 (1968). Liability should not be imposed, however, where the activity at issue was not unusual, reasonable safeguards against injury could have been provided by taking well-recognized safety measures, and a responsible and experienced contractor was selected. *Funk v. Gen. Motors Corp.,* 392 Mich. 91, 110, 220 N.W.2d 641, 649 (1974).

In *Inglis v. Millersburg Driving Association,* 169 Mich. 311, 136 N.W. 443 (1912), one of the earliest Michigan cases to apply this doctrine, the plaintiff sued the defendants for injuries to his land and destruction of his timber when a fire the defendants set to clear their land spread to the plaintiff's land. Near the close of trial, the defendants introduced into evidence a contract between the defendant association and an independent contractor for the clearing of the defendants' property, for the purpose of setting up the defense that an independent contractor was responsible for the damage to the plaintiff's property. Based upon the contract, the trial court directed a verdict in favor of the defendants on the ground that they were not responsible for the acts of an independent contractor. The Michigan Supreme Court held that the trial court erred in granting judgment to the defendants because, it concluded, the defendants were estopped by their conduct from raising the independent contractor defense in the first instance. Aside from an estoppel, however, the court held that the defendant could not escape liability for the negligent acts of the independent contractor because the evidence established that conditions were very dry and the defendants were aware of the danger posed by setting open fires. The court applied the following rule:

> Where the work is dangerous of itself, or as often termed, "inherently" or "intrinsically" dangerous, unless proper precautions are taken, liability cannot be evaded by employment of an independent contractor. Stated in another way, where injuries to third persons must be expected to arise, unless means are adopted by which such consequences may be prevented, the contractee is

bound to see to the doing of that which is necessary to prevent the mischief. The injury need not be a necessary result of the work, but the work must be such as will probably, and not which merely may, cause injury if proper precautions are not taken.

*Id.* at 319–20, 136 N.W. at 447. The court also observed that the rule is not without limits:

It is not applied to those cases where the injuries occur which are collateral to the employment, like the dropping of material by the servant of a contractor upon a person passing by, but where a duty is imposed upon the employer in doing work necessarily involving danger to others, unless great care is used, to make such provision against negligence as may be commensurate with the obvious danger.

*Id.* at 321, 136 N.W. at 447.

In *Oberle v. Hawthorne Metal Products Co.*, 192 Mich.App. 265, 480 N.W.2d 330 (1991)(per curiam), the court held that there was sufficient evidence for the jury to decide whether the work in question was inherently dangerous. The plaintiff, an employee of an independent contractor hired by the defendant to install a press in a thirteen-foot-deep pit in the defendant's plant, was seriously injured when he walked into the unguarded pit. The plaintiff's evidence established that installation of a press into a thirteen-foot-pit, without guardrails or other barriers to protect those working in and around the pit from falling into it, presented a situation involving peculiar risk or special danger of physical harm. *Id.* at 269, 480 N.W.2d at 333. In addition, the plaintiff presented evidence that the defendant was aware that the work was inherently dangerous because it prepared the blueprints for the job and knew that installation of the press would involve working around the unguarded pit. *Id.* The inherently danger-

ous activity doctrine was also found to apply in *Vannoy v. City of Warren,* 15 Mich.App. 158, 166 N.W.2d 486. There, the plaintiff's husband died when he was overcome by deadly gas while working in a manhole in connection with the installation of a sewer. The plaintiff argued that the city, which had hired the plaintiff's husband's employer as an independent contractor, was liable under the inherently dangerous activity doctrine. The court concluded that the issue was properly submitted to the jury, stating, "It is ludicrous to intimate that working in an atmosphere of deadly, tasteless, odorless and colorless gas without any protective devices is not a dangerous activity." *Id.* at 164, 166 N.W.2d at 489.

Where the activity does not present any unusual or extraordinary risk, liability will not be imposed when a risk is subsequently created by the negligence of the independent contractor. For example, in *Bosak v. Hutchinson,* 422 Mich. 712, 375 N.W.2d 333 (1985), the plaintiff's hand was injured while he was assisting in erecting a crane in cold, wet conditions late in the day with poor lighting. The plaintiff, an employee of the subcontractor, sued the contractor, alleging liability under the inherently dangerous doctrine. The court concluded that the doctrine was not applicable under the facts of the case, based upon this limitation:

It must be emphasized, however, that the risk or danger must be "recognizable in advance," *i.e.,* at the time the contract is made, for the doctrine to be invoked. Thus, liability should not be imposed where a new risk is created in the performance of the work which was not reasonably contemplated at the time of the contract.

*Id.* at 728, 375 N.W.2d at 340. The dangerous activity was not the erection of the crane, the court stated, but rather erecting

the crane with inadequate lighting. *Id.* at 729, 375 N.W.2d at 340. Because there was no evidence that the general contractor was aware of the need to erect a crane on the job site or that the erection would be done at night, the general contractor could not have known that the erection of the crane, which the court described as "a fairly routine job as construction jobs go," would have involved inherently dangerous activity. *Id.* at 729–30, 375 N.W.2d at 340–41.

Courts have also held that liability does not arise under this doctrine where the particular job was not unusual, well-recognized safety measures could have been taken to prevent the injury, and the contractor was responsible and experienced. For example, in *Funk v. General Motors Corp.*, 392 Mich. 91, 220 N.W.2d 641 (1974), the court held that General Motors could not be held liable for the injuries to the plaintiff, who fell from the roof of a building while he was installing piping, because the job was not an unusual construction job and standard safety measures, such as suspending nets, scaffolding, bucket cranes, and safety belts, could have been provided by the plaintiff's employer. *Id.* at 102, 110, 220 N.W.2d 641, 645, 649. Similarly, in *Rasmussen v. Louisville Ladder Co.*, 211 Mich.App. 541, 536 N.W.2d 221 (1995)(per curiam), the court held that the inherently dangerous activity doctrine did not apply because the activity which the defendant hired the independent contractor to perform was "the fairly routine task of constructing a multistory building using hanging scaffolding." *Id.* at 549, 536 N.W.2d at 225. The dangerous activity that caused the plaintiffs' injury was not the use of scaffolding, but the independent contractor's decision to forgo the use of steel safety cables. *Id.* According to the court, the defendant anticipated that the

independent contractor would use reasonable safeguards and there was no evidence that the defendant knew that the independent contractor (the plaintiff's employer) would substitute hemp rope for steel safety cables. *Id.See also Helzer v. CBS Boring & Machine Co.*, No. 205805, 1999 WL 33441300, at *2 (Mich.Ct.App. June 8, 1999)(per curiam)(concluding that "shutting off the main power before working on the crane was a well-recognized safety measure in the industry" which would have prevented the plaintiff's injuries).

■■■ Amoco argues that installing drainage tile with a large piece of equipment across an underground pipeline without taking any precautions to avoid striking it is an inherently dangerous activity. While that may be true, Larry Timm hired HDS to install drainage tile in his field, a fairly routine task. As in *Funk* and *Rasmussen*, a reasonable safeguard existed that would have prevented the injury in this case: a telephone call to MISS–DIG. Contacting MISS–DIG was a precaution Larry Timm could have reasonably expected HDS and the Hermans to take because, as discussed above, the MISS–DIG statute places a duty upon the person responsible for the excavating to contact MISS–DIG. That routine precaution was taken by Larry Timm when he performed his work in the east field and by Eric Herman when he performed the work in the east field. Contacting MISS–DIG is not a requirement only when the person has knowledge of the existence of an underground facility; rather, it is a requirement in all cases. The nature of the work of installing drainage tile was not transformed into an inherently dangerous activity simply because Larry Timm and the Hermans had actual knowledge of the pipeline.[4] Under Amoco's argument, almost any routine activity

---

4. In fact, it seems obvious that having knowledge of the existence of an underground utility makes the work *less dangerous* than not having such knowledge.

could be turned into an inherently dangerous activity. For example, most electrical work is not dangerous to perform. However, even the most basic work, such as installation of a light fixture, can be extremely dangerous if the person performing the work neglects to take the basic precaution of turning the power off at its source.

The evidence also shows that the Eric Herman was an experienced contractor. While Eric Herman had only performed eight or nine drainage tile installation jobs prior to performing the work for Larry Timm, he had also installed his own drainage tile and was aware of the necessity to contact MISS–DIG because he had done so on other jobs, including his work in the east field.[5] Therefore, the Court concludes that Larry Timm cannot be held liable under the inherently dangerous activity doctrine.

 Amoco also contends that Larry Timm is liable for the negligence of HDS and the Hermans pursuant to the "retained control" exception to the independent contractor rule. Under this exception, an owner who retains and exercises sufficient control over the performance of the work may be held liable for its own negligence in failing to implement reasonable safety measures. *Funk*, 392 Mich. at 108, 220 N.W.2d at 648. In other words, "the owner or general contractor's retention of supervisory control provides the basis for the imposition of an independent duty on the part of the owner or general contractor to exercise its retained control with reasonable care." *Candelaria*, 236 Mich.App. at 73, 600 N.W.2d at 352. The Court concludes that the "retained control" exception does not apply in this case for two reasons. First, in order for the exception to apply, there must be a "common work area shared by the employees of more than one subcontractor." *Groncki v. Detroit Edison Co.*, 453 Mich. 644, 662, 557 N.W.2d 289, 297 (1996). Here, there was no common work area shared by employees of different subcontractors in many different trades, as in *Funk. See Funk* at 645, 220 N.W.2d at 645. Second, there is no evidence that Larry Timm retained supervisory or coordinating authority over the job site. Although there is no bright line test, the cases suggest that the owner must at least be involved in the performance of the work in some aspect. *Compare Phillips v. Mazda Motor Mfg. (USA) Corp.*, 204 Mich.App. 401, 408, 516 N.W.2d 502, 507 (1994) (stating, "[t]here must be a high degree of actual control; general oversight or monitoring is insufficient") *with Samodai v. Chrysler Corp.*, 178 Mich. App. 252, 256, 443 N.W.2d 391, 393 (1989) ("The requisite nature of this standard requires that the owner retain at least partial control and direction of *actual* construction work, which is not equivalent to safety inspections and general oversight."). Amoco contends that this exception applies because Larry Timm requested that HDS and the Hermans perform the work in the west field and specified where he wanted the drainage tiles installed. Apart from telling the Hermans what he wanted done, there is no evidence that Larry Timm

---

5. Amoco also contends that HDS and Eric Herman were not responsible because they did not have insurance. In *Funk,* the court suggested that the fact that an owner selects a contractor who is not financially responsible might have some bearing on whether the owner was negligent in selecting the contractor. However, the court also indicated that a contractor's lack of financial responsibility may be relevant in situations where the contractor's financial difficulties make the contractor less likely to observe safety precautions. *Funk,* 392 Mich. at 110 n. 14, 220 N.W.2d at 649 n. 14. There is no connection here between HDS's lack of insurance and the injury as a matter of law because the failure to observe the safety precaution—making a telephone call—could not have been influenced by a desire to cut corners on safety or insurance.

visited the work site while the work was being performed to oversee or direct their work. Thus, there is no evidence that Larry Timm controlled or directed the actual construction work.

### D. Liability of Carlen Timm

■ The Timms argue that Carlen Timm cannot be held liable for Amoco's injuries because she did not make the decision to hire, nor did she hire, the Hermans. She contends that her only role was writing the checks to pay HDS for its work when the bills were finally submitted after the accident. Amoco contends that Carlen Timm is liable because she and Larry Timm were engaged in a joint enterprise. In describing the relationship between Larry and Carlen Timm, Amoco uses the terms "joint enterprise" and "joint venture" interchangeably. While those terms both rely on the law of principal and agent and are closely related, they mean different things. A "joint enterprise" is generally used to describe a noncommercial joint adventure, for example, in the operation of an automobile resulting in injury, while a "joint venture" is usually undertaken for profit. *First Pub. Corp. v. Parfet*, 246 Mich.App. 182, 188, 631 N.W.2d 785, 789 (2001)(per curiam); *Berger v. Mead*, 127 Mich.App. 209, 215–16, 338 N.W.2d 919, 923 (1983)(per curiam). Because Amoco contends that Larry and Carlen Timm operated the farming operation for profit, the issue is whether a "joint venture," as distinguished from a "joint enterprise," existed. A joint venture consists of the following elements: (1) an agreement showing an intention to undertake a joint venture; (2) a joint undertaking of a single business enterprise for profit; (3) sharing of profits and losses; (4) contribution of skills or property by the parties; (5) community of interest and control over the subject of the enterprise. *Berger*, 127 Mich.App. at 214–15, 338 N.W.2d at 922.

The Timms argue that a joint venture could not have existed between the Timms because running a family farm is not a single project or business enterprise. The Timms have not cited any authority from Michigan to support their argument. However, courts from other jurisdiction have recognized that farming may be the subject of a joint enterprise, *see, e.g., Myers v. Lillard*, 215 Ark. 355, 220 S.W.2d 608 (1949), and this Court sees no reason why that could not be so in this case.

Amoco contends that it has presented sufficient evidence to support summary judgment in its favor on the issue of a joint venture. In particular, Amoco points to the following: (1) Larry Timm's testimony that the farm was a joint operation which the Timms had operated for the 23 years of their marriage; (2) the fact that Carlen Timm primarily handles the financial affairs of the farm, although she does help out in the field on occasion; (3) the fact that the trucks used in the farming operation bear the logo "Timm Farms"; and (4) the fact that anything left after the expenses are paid is the Timms' profit.

■ The Court concludes, based upon the evidence in the record, that whether Larry Timm and Carlen Timm are joint venturers is a question of fact for the jury. In *Miller v. City Bank and Trust Co.*, 82 Mich.App. 120, 266 N.W.2d 687 (1978), the issue was whether a husband and wife operated a nursery business as a partnership. The evidence established that the wife, who was the plaintiff in the case, kept all the books and hired and fired employees. In addition, the husband and wife each received periodic payments from the business account at the same time and in the same amounts. *See id.* at 122, 266 N.W.2d at 689. There was also evidence that the husband had referred to his wife as his "partner" and had filed a business registration certificate indicating that the

business was a partnership. *Id.* at 122–23, 266 N.W.2d at 689. In spite of that evidence, the trial court held that there was no partnership, and the Michigan Court of Appeals affirmed. The court of appeals noted that while the party asserting a partnership has the burden of proof, that burden is even "stricter" where the alleged partners are relatives. *Id.* at 123, 266 N.W.2d at 689–90. The court of appeals held that there was sufficient evidence to support a finding of no partnership. For example, the court observed that the fact that the husband and wife received equal payments might show nothing more than the husband's desire to share equally with his wife. *Id.* at 125, 266 N.W.2d at 690. Similarly, the court stated that the fact that the wife performed work for the business could be viewed simply as the acts of a helpful wife assisting her husband. *Id.* In addition, there was no partnership agreement and the income tax returns and schedules and other documents listed the business as a sole proprietorship. *Id.* at 126–27, 266 N.W.2d at 691.

While the evidence presented by Amoco may provide a basis for concluding that Larry and Carlen Timm operate the farm as a joint venture, it is just as consistent with acts normally arising in the husband-wife relationship that have nothing to do with a joint venture. *See generally,* 46 Am.Jur.2d *Joint Ventures* § 58 (1994). For example, the financial and bookkeeping services provided by Carlen Timm may show nothing more than that Carlen Timm desires to be helpful to her husband in his business. Thus, in light of the "stricter" burden of proof Amoco bears on this issue, the evidence does not establish the absence of a genuine issue of material fact on this issue.

## II. Motion to Amend

In its motion to amend, Amoco seeks to add a claim under the Michigan Natural Resources Environmental Protection Act ("NREPA"). Amoco claims that it learned facts through discovery which would support a claim under this statute.

On February 26, 2001, the Court entered a Case Management Order. Pursuant to that Order, the parties had until March 31, 2001, to amend pleadings and until September 15, 2001, to complete discovery. Under Rule 15(a) of the Federal Rules of Civil Procedure, once a responsive pleading has been filed, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a). Rule 15(a) also provides that "leave shall be freely given when justice so requires." *Id.* The mandate that "leave shall be freely given" embodies "the principle that cases 'should be tried on their merits rather than the technicalities of the pleadings.'" *Moore v. City of Paducah,* 790 F.2d 557, 559 (6th Cir.1986)(per curiam)(quoting *Tefft v. Seward,* 689 F.2d 637, 639 (6th Cir.1982)). However, because a Rule 16 order has been entered in this case, the Court can consider whether Amoco has satisfied the more liberal standards of Rule 15(a) only if Amoco makes the showing required by Rule 16(b) for modification of a scheduling order. *W. Va. Hous. Dev. Fund v. Ocwen Tech. Xchange, Inc.,* 200 F.R.D. 564, 566 (S.D.W.Va.2001). Rule 16(b) states that "[a] schedule shall not be modified except upon a showing of good cause."

Rule 16(b)'s "good cause" standard is much different than the more lenient standard contained in Rule 15(a). Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment. Properly construed, "good cause" means that scheduling deadlines cannot be met despite a party's diligent efforts.

*Dilmar Oil Co. v. Federated Mut. Ins. Co.,* 986 F.Supp. 959, 980 (D.S.C.1997) (citations omitted); *see also United States v. Boyce,* 148 F.Supp.2d 1069, 1078 (S.D.Cal.2001)(noting that Rule 16(b)'s "good cause" inquiry focuses upon the diligence of the party seeking the amendment); *Scheidecker v. Arvig Enters., Inc.,* 193 F.R.D. 630, 631 (D.Minn.2000)("The 'good cause' standard is an exacting one, for it demands a demonstration that the existing schedule 'cannot reasonably be met despite the diligence of the party seeking the extension.'" (quoting Federal Rules of Civil Procedure, Advisory Comm. Notes—1983 Am.)).

The Court concludes that Amoco has failed to meet Rule 16(b)'s "good cause" standard. Amoco states in its motion that it became aware of the facts supporting a claim under NREPA after it completed the depositions of all defendants in July 2001, several months after the deadline for amendments. For the most part, however, Amoco became aware of all pertinent facts in December 2000, when it deposed the Hermans—at least two months before the scheduling order was even entered. Based upon those depositions, Amoco had all the necessary facts to plead a claim under NREPA. Moreover, Amoco does not identify what particular facts it became aware of after the deadline for amendments passed that alerted it to the possibility of a NREPA claim in this case. Finally, the Court notes that Amoco did not take prompt action, but rather waited almost four months before filing its motion to amend. This conduct does not demonstrate diligence. Therefore, the motion will be denied.

### Conclusion

For the foregoing reasons, the Court will grant Amoco's motion for summary judgment in part and deny it in part. The motion will be granted with respect to Eric Herman and HDS on Amoco's claims for violation of the MISS–DIG act (Count I), negligence (Count II), and trespass (Count III); with respect to James Herman on the negligence and trespass claims; and with respect to Larry Timm on the trespass claim. The motion will be denied as to all Defendants on the inherently dangerous activity claim (Count IV), and that Count will be dismissed with prejudice. The motion will be denied with respect to Larry Timm on Amoco's claims for violation of the MISS–DIG act and negligence. The motion will also be denied with respect to Carlen Timm. The Court will also grant and deny in part Defendants Larry and Carlen Timms' motion for summary judgment. The motion will be granted with respect to the claim for violation of the MISS–DIG act and the inherently dangerous activity claims. The motion will be denied with respect to the trespass and negligence claims against Larry Timm and with respect to Carlen Timm on the issue of joint venture. Finally, the Court will deny Amoco's motion to amend its complaint.

An Order consistent with this Opinion will be entered.

### *ORDER*

In accordance with the Opinion filed this date,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment (docket no. 49) is **GRANTED IN PART AND DENIED IN PART.** The motion is **granted** with respect to Plaintiff's claims against Defendants Eric Herman and Herman Drainage Systems, Inc. for violation of the MISS–DIG act (Count I), negligence (Count II), and trespass (Count III); against Defendant James Herman on the negligence and trespass claims; and against Defendant Larry Timm on the trespass claim. The motion is **denied** with respect to Plaintiff's inherently dangerous activity claim against all

Defendants, and that claim (Count IV) is hereby **dismissed with prejudice.** The motion is **denied** with respect Plaintiff's claims against Defendant Larry Timm for violation of the MISS–DIG statute and negligence. Finally, the motion is **denied** with respect to all claims against Defendant Carlen Timm.

**IT IS FURTHER ORDERED** that Defendants Larry and Carlen Timms' Motion for Summary Judgment (docket no. 48) is **GRANTED IN PART AND DENIED IN PART.** The motion is **granted** with respect to Plaintiff's claims against Defendants Timm for violation of the MISS–DIG act and inherently dangerous activity. The motion is **denied** with respect to Plaintiff's negligence and trespass claims against both Defendants.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Amend Complaint (docket no. 56) is **DENIED.**